## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF GEORGIA
## SAVANNAH DIVISION

**FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR DARBY BANK & TRUST CO.,**

          **Plaintiff,**

**v.**

**WALTER B. BOWDEN, WILLIAM E. BEDINGFIELD, WILLIAM EMORY DAVIS, DONALD H. ESTROFF, J. EDWARD TYSON, CONNIE DARBY WILLIAMS, RICHARD D. WILLIAMS, RICHARD A. WILLIAMS, DONALD R. COOMER, WAYNE D. HARTLEY, S. WAYNE SMITH, MICHAEL ZOLLER, J. CHRISTOPHER BANKS, STEPHEN D. COOMER, DONALD M. THOMPSON and STANLEY E. HARP, JR.,**

          **Defendants.**

C V 4 1 3 - 2 4 5

**JURY DEMANDED**

**CIVIL ACTION NO.**


## COMPLAINT FOR DAMAGES

For its Complaint against the Defendants, the Federal Deposit Insurance Corporation ("FDIC"), as Receiver for Darby Bank & Trust Co. ("FDIC-R") pleads as follows:

## I.

## INTRODUCTION

1.     The FDIC brings this case in its capacity as Receiver for Darby Bank & Trust Co. ("Darby" or "Bank") pursuant to authority granted by 12 U.S.C. § 1821.

2.     In this action, the FDIC-R seeks to recover losses of at least $15.1 million that the Bank suffered on commercial real estate loans and other business and residential loans (collectively, the "Loss Transactions") approved or permitted by Defendants between November 17, 2007 and October 26, 2009, as alleged more particularly below, as well as other losses incurred by Darby and FDIC-R. Defendants are former Darby officers Walter B. Bowden, J. Christopher Banks, Stephen D. Coomer, Donald M. Thompson and Stanley E. Harp, Jr. (collectively, the "Officer Defendants"), and non-officer directors William E. Bedingfield, Emory Davis, Donald Estroff, J. Edward Tyson, Connie Darby Williams, Richard D. Williams, Richard A. Williams, Donald R. Coomer, Wayne D. Hartley, Wayne

Smith, and Michael Zoller (collectively, the "Director Defendants") (collectively, the Officer Defendants and the Director Defendants are referenced herein as "Defendants").

3.     As officers and directors, Defendants had the duty to safeguard Darby's financial condition, prudently manage the Bank, make informed, good faith decisions, and ensure safe and sound banking practices. Defendants were responsible for prudent and reasonable use of Bank assets, including oversight and management of Darby's lending function. Defendants were obligated to comply and ensure compliance with banking laws, regulations and supervisory guidance, and the Bank's own written loan policies and procedures.

4.     Defendants were negligent, were grossly negligent, and breached their fiduciary duties by, among other things, recommending, presenting for approval, and/or participating in the approval of loans that violated Darby's internal policies and prudent, safe, and sound banking practices.

5.     Among other things, Defendants:

     (i)     failed to establish proper and complete loan underwriting policies;

     (ii)     failed to monitor compliance with loan policies, rules, regulations, and supervisory direction and guidance;

(iii)    participated in, approved, or permitted poor loan underwriting in contravention of Darby's written loan policies, applicable rules and regulations, supervisory direction and guidance, and reasonable industry standards;

(iv)    recommended and/or approved loans that they knew or had reason to know were improperly underwritten and/or imprudent, including origination and/or renewal of loans in which the borrowers lacked the demonstrated ability to repay, collateral was inadequate, and/or collectability was not reasonably assured;

(v)    recommended and/or approved loans despite the failure to correct deficiencies and weaknesses in the underwriting process previously identified by regulators, professional advisors, and/or the Bank's own internal audit function;

(vi)    continued to approve commercial real estate ("CRE") loans, including acquisition, development, and construction ("ADC") loans, despite high-risk over-concentrations of such loans on the Bank's balance sheet, demonstrable deterioration in the Bank's existing CRE and ADC loan portfolios, and known adverse economic and market conditions;

(vii)     permitted draws on development and construction loans to be made without proper inspections or any inspections of the property;

(viii)    failed to address deficiencies and weaknesses in the loan administration and review function identified by regulators,  professional advisors, and/or the Bank's own internal audit function; and

(ix)     failed to record charges for impaired loans or make adequate provision for and maintenance of allowances for loan and lease losses ("ALLL") for loans for which losses were probable and estimable.

6.     Defendants are liable to the FDIC-R for the damages caused by their negligence, gross negligence, and breaches of fiduciary duty.  The FDIC-R does not seek to collect upon outstanding loans, but rather seeks to collect damages flowing from the Defendants' negligence, gross negligence, and breaches of fiduciary duty, which include, among other things, lost operating capital, lost profits, and lost investment opportunities.

## II.

## THE PARTIES

7.      Plaintiff FDIC-R was appointed as Receiver for Darby on November 12, 2010, by the Georgia Department of Banking and Finance ("GDBF"). Pursuant to 12 U.S.C. § 1821(d)(2)(A)(i), the FDIC-R succeeded to all rights, titles, and privileges of the Bank and, among others, the Bank's shareholders, account-holders, and depositors, including, but not limited to, the right to pursue claims against the Bank's former officers and directors, including the claims asserted against Defendants.

8.      Darby, a state non-member bank, was closed by the GDBF on November 12, 2010.  At the time it was closed, Darby held approximately $654.7 million in assets.  Darby's failure has resulted in a loss to the Deposit Insurance Fund of approximately $164.6 million as of December 31, 2012.  Darby had been wholly owned by DBT Holding Company ("DBT"), a private, single-bank holding company, which filed for bankruptcy on April 4, 2011, and was administratively dissolved in September 2012.

9.      Defendant Walter B. Bowden ("Bowden") is a resident citizen of Lyons, Georgia.  Bowden served as both a Director of the Bank and as the Bank's Chief Executive Officer ("CEO") from 1995 until he retired in December 2008.

{00387959.DOCX / }                          6

During all times relevant to the claims set forth herein, Bowden served on the Bank's Directors Loan Committee ("DLC").

10.     Defendant William E. Bedingfield ("Bedingfield") is a resident citizen of Vidalia, Georgia.  Bedingfield served as a Director of the Bank from 1999 until the Bank closed in November 2010.  During all times relevant to the claims set forth herein, Bedingfield also served as a member of the DLC.

11.     Defendant William Emory Davis ("Davis") is a resident citizen of Vidalia, Georgia.  Davis served as a Director of the Bank from at least 2005 until May 2010.  During all times relevant to the claims set forth herein, Davis also served as a member of the DLC while he was a director.

12.     Defendant Donald H. Estroff ("Estroff") is a resident citizen of Tybee Island, Georgia.  Estroff served as a Director of the Bank from 1963 until 2007. He was Chairman of the Board of Directors from 1999 to 2007.  During all times relevant to the claims set forth herein and until his departure from the Board, Estroff also served as a member of the DLC.

13.     Defendant J. Edward Tyson ("Tyson") is a resident citizen of Vidalia, Georgia.  Tyson served as a Director of the Bank from 1991 until February 2007. During all times relevant to the claims set forth herein and until his departure from the Board, Tyson also served as a member of the DLC.

14.    Defendant Connie Darby Williams ("C. Williams") is a resident citizen of Savannah, Georgia. C. Williams served as a Director from 1991 until the Bank closed in November 2010. She also served as Chairwoman of the Board from March 2007 to the Bank's failure. During all times relevant to the claims set forth herein, C. Williams also served as a member of the DLC. C. Williams owned 5.5 percent of DBT stock and was also a general partner and a beneficiary of the Darby Family Limited Partnerships (collectively, the "Darby Family LP"), which owned 32 percent of DBT stock.

15.    Defendant Richard D. Williams ("R.D. Williams") is a resident citizen of Savannah, Georgia. R.D. Williams served as a Director from January 1996 until the Bank closed in November 2010. During all times relevant to the claims set forth herein, R.D. Williams also served as a member of the DLC. R.D. Williams was a beneficiary of the Darby Family LP.

16.    Defendant Richard Allen Williams ("R.A. Williams") is a resident citizen of Savannah, Georgia. R.A. Williams served as a Director from 2005 until the Bank closed in November 2010. During all times relevant to the claims set forth herein, R.A. Williams also served as a member of the DLC. R.A. Williams was a beneficiary of the Darby Family LP.

17.     Defendant Donald R. Coomer ("D. Coomer") is a resident citizen of Savannah, Georgia.  D. Coomer served as a Director from 2004 until the Bank closed in November 2010.  D. Coomer also served as Chair of the Audit Committee.

18.     Defendant Wayne D. Hartley ("Hartley") is a resident citizen of Lyons, Georgia. Hartley served as a Director from March 2007 until the Bank closed in November 2010.

19.     Defendant S. Wayne Smith, Sr.  ("Smith") is a resident citizen of Lyons, Georgia.  Smith served as a Director from 1991 until February 2009.

20.     Defendant Michael Zoller ("Zoller") is a resident citizen of Savannah, Georgia.  Zoller served as a Director from March 2007 until the Bank closed in November 2010.

21.     Defendant J. Christopher Banks ("Banks") is a resident citizen of Savannah, Georgia.  Among other capacities, during all times relevant to the claims set forth herein, Banks served as Senior Vice President and Chief Loan Officer ("CLO"), and was a DLC member from 2002 until September 2009.

22.     Defendant Stephen Coomer ("S. Coomer") is a resident citizen of Savannah, Georgia. Among other capacities, S. Coomer served as the Bank's

Group Vice President and Manager of Commercial Lending from April 1997 until the Bank failed in November 2010.

23.     Defendant Donald M. Thompson ("Thompson") is a resident citizen of Savannah, Georgia. Among other capacities, Thompson was Senior Vice President and manager of the Bank's Savannah City branch from 2005 until he retired in September 2009.

24.     Defendant Stanley E. Harp, Jr. ("Harp") is a resident citizen of Hahira, Georgia. Among other capacities, Harp served as President of the Bank's Valdosta branch and a loan officer from January 2007 until his employment was terminated in February 2009. Harp filed for bankruptcy and his debts were discharged in 2010. Accordingly, pursuant to 11 U.S.C. §524(e), the FDIC names Harp as a nominal defendant solely in order to seek recovery on the applicable Directors and Officers Liability Policy. On or about October 24, 2013, the bankruptcy court granted the FDIC's motion to reopen the case and lift the automatic stay to allow this action to be filed against Harp solely in order to seek recovery on the applicable Directors and Officers Liability Policy.

25.     CEO Bowden had responsibility for overall management of the Bank, including but not limited to ensuring that the Bank adopted, maintained, and adhered to adequate loan policies, procedures, and internal controls, and that the

Bank followed safe and sound banking practices.  Bowden had the duty to advise the Bank's Board of Directors ("Board") and senior management against taking actions that violated the Bank's internal policies or safe and sound banking practices.

26.    The duties of CLO Banks, Darby's chief lending officer, included responsibility for the Bank's lending operations, including but not limited to ensuring that Darby adopted, maintained, and adhered to adequate loan policies and followed safe and sound lending practices.  Banks' duties as CLO included the duty to advise the Board and senior management against taking actions that violated the Bank's internal policies or safe and sound lending practices.

27.    Among other things, as Directors of the Bank, Bowden, Bedingfield, D. Coomer, Davis, Estroff, Hartley, Smith, Tyson, C. Williams, R.D. Williams, R.A. Williams, and Zoller were responsible for selecting, monitoring, and evaluating the Bank's senior management; establishing business strategies and policies that comported with safe and sound banking practices; monitoring and assessing the Bank's business operations; establishing and monitoring adherence to policies and procedures required by statute, regulation, and principles of safety and soundness; reviewing and approving the actions of the DLC, including but not limited to the DLC's action in approving the loans referenced herein; overseeing

the activities and actions of the Officer Loan Committees ("OLCs") and the Bank's loan officers; heeding warnings and following directives by the Bank's regulators; and making business decisions on the basis of fully informed and meaningful deliberation. These duties included the duty to supervise senior management so as to prevent the Bank from taking actions that violated the Bank's internal policies or safe and sound banking practices.

28.     As members of the Bank's DLC, Bowden, Banks, Bedingfield, Davis, Estroff, Tyson, C. Williams, R.D. Williams, and R.A. Williams were responsible for deciding whether and on what terms the Bank would grant loans to borrowers. Each DLC member had a duty to make prudent loan decisions based on adequate information about the use of loan proceeds, the creditworthiness of borrowers and guarantors, the value of underlying collateral, the source(s) of repayment, collectability, the composition and condition of the Bank's loan portfolio, including the risks arising from any concentrations of credit, and other circumstances relevant to making an informed and prudent decision.

29.     As members of OLCs and/or as loan officers with authority to approve and/or recommend loans, defendants Bowden, Banks, S. Coomer, Thompson, and Harp were responsible for deciding whether and on what terms the Bank would grant loans to borrowers. Each of them had a duty to make prudent

loan recommendations and decisions based on adequate information about the use of loan proceeds, the creditworthiness of borrowers and guarantors, the value of underlying collateral, the source(s) of repayment, collectability, the composition and condition of the Bank's loan portfolio, including the risks arising from any concentrations of credit, and other circumstances relevant to making an informed and prudent decision; to exercise diligence and reasonable care in gathering and analyzing information necessary to enable approval authorities to make well-informed and reasonable decisions; and to adhere to all applicable provisions of the Bank's Loan Policies.

**III.**

**JURISDICTION AND VENUE**

30.    This Court has subject matter jurisdiction for this action pursuant to 12 U.S.C. § 1811 *et seq.*, 12 U.S.C. §§ 1819(b)(1) and (2)(a), and 28 U.S.C. §§ 1331 and 1345. The FDIC is a corporation organized and existing under the laws of the United States of America and brings this action in its receivership capacity. Actions to which the FDIC is a party are deemed to arise under the laws of the United States. The FDIC, including in its capacity as Receiver, has the authority to sue in any court of law. 12 U.S.C. § 1819.

31.     This Court has personal jurisdiction over the Defendants, who at all relevant times resided in and conducted business in the state of Georgia.

32.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because all or substantially all of the acts charged herein occurred in this district and the claims arose in this district.

## IV.

## FACTUAL ALLEGATIONS

### A.     Background.

33.     Darby was formed in Vidalia, Georgia, in 1927 as a state-chartered, non-member bank.

34.     Under Defendant Bowden, Darby expanded its lending area into the Georgia coastal markets and opened branches in Savannah and Valdosta.

35.     During Defendant Bowden's 14-year tenure, the Bank grew rapidly in assets, primarily through the funding of large numbers of CRE loans, including ADC loans.  Darby's assets increased from approximately $55 million in 1995 to $800 million in 2008.

36.     In a CRE loan, a bank takes a security interest in real property used for commercial purposes as an additional source of repayment for a loan related to that property.   The Bank's Loan Policy emphasized that the value of real estate

collateral to secure a loan was not a substitute for a prospective borrower's ability to repay.

37.     Regulators, the real estate industry, and lending institutions recognize that CRE loans have unique risks.  The borrower base includes significant numbers of project developers, builders, and speculators, often with multiple concurrent projects, whose revenues and costs are subject to fluctuations in real estate values, among other things.

38.     ADC loans are a subset of CRE loans.  In an ADC loan, loan proceeds are used to acquire, develop and/or construct commercial projects, such as single family residential subdivisions, commercial office buildings, condominiums, and similar projects.  ADC loans are even more inherently risky that CRE loans and more susceptible to fluctuations in real estate values.

39.     From time to time, promoters will obtain "land development" loans to develop (or acquire and develop) land for specific end uses, and then sell the property to builders or other buyers to construct dwellings or other buildings.

40.     The Bank's Loan Policy recognized the unique risks of ADC loans. For example, according to the Policy, "[a]lthough not considered undesirable," certain types of loans, including real estate development loans, were deemed to pose "an additional level of concern for lending personnel.  [Such] loans [have

been] identified by most financial institutions as excessive risk industries that have generally caused difficulties or losses in the past.  Loans to these industries should be made only by lenders experienced in these types of lending after considerable investigation and evaluation.  Extreme care should be used to have all documentation in place and to monitor these types of loans carefully."

(i)  <b>Defendants Failed to Address Repeated Warnings to Control Significant CRE Loan Overconcentration Risks.</b>

41.  As early as 2004, regulators warned Darby's Board that the Bank's rapid and aggressive growth in CRE and ADC loans threatened the Bank's safety. In a letter dated August 10, 2004, addressed to the Darby Board, transmitting a report of examination that commenced on June 9, 2004, regulators warned that the overall condition of the Bank had declined, was in a borderline condition, and was at risk of regulatory administrative action.  It stated that management needed to focus more on loan quality instead of growth and advised the Board that the regulators would require a written action plan to reduce the Bank's adversely classified loans and Other Real Estate (i.e., real estate taken in foreclosure, or "ORE").

42.  On August 19, 2004, regulator representatives discussed and reviewed the examination results with the Board.  Bowden and the Director Defendants

(except Hartley and Zoller) attended the meeting and were instructed to read and sign the report.

43.    Bank regulators noted, again, the risks posed by Darby's aggressive CRE lending in a report of examination commenced on June 6, 2005, and sent to the Board of Directors on or about July 20, 2005, which Bowden and all the Non-Officer Director defendants acknowledged to have read.  The Report noted that the Bank in 2004 had charged off a record $7.4 million in problem loans due in part to rapid loan growth without proper controls.

44.    Notwithstanding the regulators' admonition, Defendants accelerated Darby's rate of CRE lending at the expense of quality and soundness.  In the 18 months from June 30, 2004 to December 31, 2005, CRE loans grew from approximately $293 million to $382 million, a 35 percent increase.

45.    On or about January 13, 2006, the FDIC issued Financial Institution Letter FIL-4-2006, "Commercial Real Estate Lending," announcing proposed guidance by the federal bank and thrift regulatory agencies concerning sound risk management practices for concentrations in CRE lending.  The proposed guidance became final on December 12, 2006. *Guidance on Concentrations in Commercial Real Estate Lending, Sound Risk Management Practices*, 71 Fed. Reg. 74580-01 (Dec. 12, 2006) ("CRE Guidance").  As explained in the release, the agencies issued

the guidance in light of the increase in the number of banks whose risk management practices were not evolving with growing CRE concentrations. The release noted the existence of "substantial potential risks posed by credit concentrations, especially in sectors such as CRE, which history has shown to have cycles that can, at much lower concentration levels, inflict large losses upon institutions," and that "concentrations in CRE lending coupled with weak loan underwriting and depressed CRE markets have contributed to significant credit losses in the past."

46.     Among other things, the Guidance stated that regulators would consider banks with CRE concentrations exceeding 300 percent of risk-based capital, or ADC concentrations exceeding 100 percent of risk-based capital, potentially exposed to significant CRE concentration risk, thereby warranting heightened risk-management practices.  While not adopting regulatory "limits," the Guidance stressed that "strong risk management practices and appropriate levels of capital are important elements of a sound CRE lending program, particularly when an institution has a concentration in CRE loans."   The Guidance admonished banks that the "key elements in establishing a risk management framework that effectively identifies, monitors, and controls CRE concentration risk [include] Board and management oversight;  portfolio  management;  management  information  systems;  credit

underwriting standards; portfolio stress testing and sensitivity analysis; [and] credit risk review function."

47.    Notwithstanding the regulators' direct warnings to the Board and promulgation of the CRE Guidance, Defendants continued to promote Darby's CRE growth and increase its significant overconcentration risk.   For the period of December 31, 2006 through December 31, 2008, the table below shows Darby's CRE and ADC concentrations as a percentage of total risk-based capital and in comparison to Darby's peer banks, based on data in Darby's quarterly Consolidated Reports of Condition and Income ("Call Reports") and Uniform Bank Performance Report ("UPBR") (all dollar amounts in $000s):

## DARBY BANK CRE AND ADC LOAN CONCENTRATIONS

| Account | Q4 2006 | Q1 2007 | Q2 2007 | Q3 2007 | Q4 2007 | Q1 2008 | Q2 2008 | Q3 2008 | Q4 2008 |
|---|---|---|---|---|---|---|---|---|---|
| Total Risk-Based Capital ("RBC") | 55,413 | 57,808 | 59,477 | 61,346 | 61,704 | 62,956 | 64,111 | 64,926 | 65,423 |
| CRE Loans | 319,869 | 341,182 | 369,000 | 348,963 | 369,880 | 356,733 | 373,054 | 356,186 | 355,906 |
| CRE as % of RBC | 577% | 590% | 620% | 569% | 599% | 567% | 582% | 549% | 544% |
| UBPR CRE Concentration Rank (percentile) | 87 | 89 | 92 | 85 | 88 | 84 | 87 | 82 | 80 |
| ADC Loans | 69,310 | 79,104 | 100,133 | 103,935 | 104,449 | 104,823 | 136,230 | 176,673 | 179,242 |
| ADC as % of RBC | 125% | 137% | 168% | 169% | 169% | 167% | 212% | 272% | 274% |
| UBPR ADC Concentration Rank (percentile) | 60 | 80 | 84 | 95 | 96 | 69 | 81 | 90 | 91 |

48.    As reflected above, during this period, in which all but two of the Loss Transactions were made, Darby's CRE concentration consistently was approximately double the regulatory threshold for significant concentration risk. Similarly, its ADC risk consistently exceeded the regulatory threshold and was more than twice the limit beginning in the second quarter of 2008.  Compared to its peer banks (insured commercial banks with assets between $300 million and $1 billion), moreover, Darby's CRE and ADC concentrations consistently ranked in the high-80[th] to mid-90[th] percentiles in this period.

49.    The information set forth in the table above was publicly available and readily accessible to all Defendants, each of whom had a duty to read and review the Bank's Call Reports and UBPRs.

50.    Notwithstanding the regulators' specific and repeated warnings to the Darby Board and the promulgation of the CRE Guidance, the Director Defendants, Defendant Bowden, and Defendant Banks ignored the need and failed to adopt risk management practices essential to identify, monitor and control CRE concentration risks.    In a report of examination commenced on August 23, 2007, the findings of which were discussed at a Board meeting on September 20, 2007 (attended by Bowden, Banks, and all Director Defendants), and sent to the Board on September 25, 2007, the regulators observed that the Bank had a massive concentration in CRE

loans equaling 707 percent of Tier 1 capital. Within this concentration, ADC loans were 192 percent of Tier 1 capital. The examiners further observed that, despite this overconcentration risk, the Board had not developed guidelines or concentration limits for CRE loans, and they emphasized that the Board needed to be more involved and set proper limits for CRE risk.

51.    As Defendants continued the Bank's reckless growth, the CRE and ADC loan portfolio significantly deteriorated.   The data in the table below is based the Bank's quarterly Call Reports:

### DARBY BANK CRE PORTFOLIO DETERIORATION ($000)

| Account | Q3 2006 | Q4 2006 | Q1 2007 | Q2 2007 | Q3 2007 | Q4 2007 | Q1 2008 | Q2 2008 | Q3 2008 | Q4 2008 |
|---|---|---|---|---|---|---|---|---|---|---|
| Past Due < 90 | 3,062 | 1,166 | 1,934 | 11,705 | 1,064 | 7,766 | 4,308 | 13,360 | 7,063 | 19,474 |
| Past Due > 90 | 782 | 73 | 0 | 0 | 0 | 18 | 0 | 3,624 | 0 | 0 |
| Nonaccrual | 1,828 | 4,841 | 4,737 | 2,983 | 4,315 | 7,182 | 8,771 | 10,173 | 19,452 | 18,492 |
| PD+Nonacc. | 5,672 | 6,080 | 6,671 | 14,688 | 5,379 | 14,966 | 13,079 | 27,157 | 26,515 | 37,966 |
| Provision for ALLL (all loans) | 2,070 | 2,730 | 600 | 1,200 | 1,800 | 3,056 | 675 | 1,715 | 3,165 | 7,215 |
| Charge-offs (all loans) | 1,256 | 2,545 | 33 | 866 | 1,293 | 3,002 | 56 | 488 | 2,010 | 5,217 |
| ALLL (all loans) | 7,351 | 7,165 | 7,753 | 7,586 | 7,845 | 7,417 | 8,102 | 8,866 | 8,810 | 9,822 |
| Nonacc/ALLL (%) | 402 | 148 | 166 | 347 | 186 | 93 | 93 | 88 | 47 | 56 |
| PD+Nonacc/ ALLL (%) | 130 | 118 | 116 | 66.1 | 146 | 49.6 | 61.9 | 32.6 | 33.2 | 25.9 |

52.    As shown above, among other things, between December 31, 2006 and December 31, 2008, during the period in which Defendants recommended, approved, or permitted most of the Loss Transactions, the dollar volume of non-

performing (or "nonaccrual") CRE loans (generally, more than 90 days past due) increased from $4.8 million to $18.5 million, a nearly 400 percent increase. Delinquent CRE Loans (generally, past due between 30 and 90 days) exploded, from approximately $1.2 million to $19.5 million, an increase of 1,600 percent. At the same time, Darby's coverage ratio, reflecting the amount of ALLL reserves as a percentage of nonaccrual loans, plummeted from approximately 150 percent to 56 percent.

53.    In addition, adversely classified loans increased from $21.1 million in 2007 to $45.7 million in 2008 to $130.5 million in 2009.

54.    As the DLC and OLCs continued to approve more Loss Transactions, Defendant Bowden, Defendant Banks, and the Director Defendants ignored the 2007 report. As documented in a report of examination commenced on May 27, 2008, which was reviewed and discussed by bank regulators at a Board meeting on August 21, 2008, attended by Bowden, Banks, and all Directors (other than Hartley), the Bank continued to have a large concentration of CRE loans equaling 567 percent of Total Risk-Based Capital, including ADC loans equaling 167 percent of Total Risk-Based Capital. Once again, despite this manifest overconcentration risk, and prior regulatory recommendations, the adverse impact of which was plainly

apparent in the deterioration of the loan portfolios, the Board had still not developed proper guidelines or concentration limits for CRE/ADC lending.

55.     Despite knowing that the Bank's CRE and ADC concentrations far exceeded the triggers for special attention, that regulators had given multiple warnings about the Bank's excessive and unsafe CRE lending, and that its portfolio was in rapid deterioration, the Board did not timely establish policy guidelines or an overall CRE lending strategy, adopt limits on CRE loan exposure, create controls to monitor such lending, develop and implement plans to reduce or mitigate concentration risks, or curb or curtail further CRE lending.

> **(ii)    Defendants Ignored Repeated Warnings to Correct Material Underwriting and Loan Approval Weaknesses.**

56.     In a report of an examination conducted by bank regulators beginning on August 1, 2006, the regulators repeated criticisms cited in the 2004 and 2005 reports of examination, and repeated past admonitions to the Board, regarding Darby's (1) rapid growth strategy coupled with weak underwriting, compounding the concentration risks in CRE loans; (2) weak loan policies; (3) lack of independence of the loan review program; (4) missing credit and collateral documentation in material amounts; (5) failure to follow safe and sound banking practices; and (6) failure to comply with examiner recommendations.

57.   The report was provided to Bowden, Banks, and the Director Defendants no later than September 21, 2006.   The regulators' transmittal letter to the Board directed the Board to ensure implementation of corrective action to improve loan underwriting and monitoring procedures criticized in the report.

58.   The report noted Darby's CRE/ADC overconcentration risks, as the Bank's CRE loan portfolio was at 689 percent of its Tier 1 capital, more than double the amount of the threshold (300 percent) considered a heightened risk.   In addition, examiners found that over $81 million in loans – nearly 20 percent of the Bank's loan portfolio – were missing credit or collateral documentation.   The report warned that missing collateral and credit documentation, such as current financial statements, income tax returns, and various other critical underwriting documents, remained missing and uncorrected even after regulatory examiners had given management a list of the deficiencies.   The report noted:   "It should be remembered that missing documentation may be the sign of a weak credit."

59.   The August 2006 report stated the Bank was making many CRE loans to borrowers who had little or no equity in projects (a violation of the Bank's Loan Policy).   In addition, many loans exceeded supervisory loan-to-value ("SLTV") ratio limitations and were not being properly identified or documented as exceptions, as required by the *Interagency Guidelines for Real Estate Lending*

*Policies*, 12 C.F.R. Part 365, Appendix A.  According to the report, management was not doing an adequate job of identifying loans made in excess of the guidelines.  The examiners expressed the concern that current practice would result in understatement of loans that exceeded loan-to-value limits, and stressed that such exceptions should be determined in the loan underwriting process.  The report stressed that this need was particularly important for Darby, given its concentrations of credit in CRE loans.

60.    At the January 20, 2007, meeting, CEO Bowden informed the Board that the Bank's nonaccrual loans (mostly CRE loans) had increased sharply from $1.4 million as of October 31, 2006, to $7.3 million as of December 31, 2006.  In response, the Defendants took no action to curtail CRE lending, to increase internal controls, or to remediate underwriting issues.  On the contrary, just a few weeks later, on March 15, 2007, the Board unanimously voted to increase the lending authority limits of the Bank's two Officer Loan Committees ("OLCs"), from $500,000 to $2 million, when previously the DLC had made lending decisions on all loans above $500,000.  In so doing, the Board actually *reduced* director oversight of the lending function.

61.    In June 2007, Darby's past due CRE loans (30-90 day delinquencies) increased 1,000 percent, from $1 million to $10.1 million, in just 30 days.

62.     Bowden sent an email to the directors on July 12, 2007, advising them that the prior month, June, was the first month in his 12-year tenure that the Bank had experienced significant below budget returns.  Bowden attributed the poor performance to "margin squeeze" and a "stressed competitive environment" in Darby's coastal markets.  Bowden's email warned the directors that the margin squeeze would "not go away anytime soon," that "there were too many competitors in Savannah," and that "the real estate market is slow for sales."

63.     In connection with Darby's June 2007 examination, examiners downgraded the Bank's "CAMELS"[1] rating for "Asset Quality" from 2 to 3, indicating that asset quality and credit administration practices were less than satisfactory, with the level and severity of classified assets, other weaknesses, and risks requiring elevated level of supervisory concern.  The report noted that risk management of the asset quality was not being monitored.  The examiners advised the Board that it should give clear direction about risk tolerance to management

---

[1]     Federal and state bank regulators use the "CAMELS" rating system to classify a bank's overall condition.  CAMELS is an acronym for Capital adequacy, Asset quality, Management, Earnings, Liquidity, and Sensitivity to market risk.  Regulators rate each factor on a scale of 1 (strongest) to 5 (weakest), and then assign a Composite CAMELS rating.  Banks that receive a rating of "3" are considered to have weaknesses that, if not corrected within a reasonable time, could lead to significant solvency or liquidity concerns.  A "4" rating indicates serious unsafe and unsound practices and/or serious financial or managerial deficiencies that result in unsatisfactory performance.  A "5" rating denotes the existence of extremely unsafe and unsound conditions, the number and severity of which are beyond management's ability or willingness to correct.

through the adoption of clear policies. They also warned that risk monitoring practices should increase and that the Directors needed to act promptly.

64.     Also in connection with their June 2007 examination of the Bank, the regulators warned that: (1) over 60 percent of the loans reviewed ($76 million) lacked critical credit or collateral information and $9 million in CRE loans lacked reliable appraisals; and (2) commercial LTV ratio exceptions constituted 66 percent ($40 million) of total capital, far in excess of the 30 percent regulatory ceiling on LTV ratio exceptions for commercial loans contained in *Interagency Guidelines for Real Estate Lending Policies*, 12 C.F.R. Part 365, Appendix A.

65.     On October 15, 2007, CLO Banks sent the Board a memorandum, admitting *inter alia*:

- "The FDIC notes that 58% of the loans reviewed had technical exceptions. . . . Given the fact that [Darby's own Internal] Loan Review cited most of these exceptions, we are without excuse. Loan review found 80% of these exceptions during their normal examination of the files before the FDIC arrived."

- "We funded approximately $3.5 million for the purchase of two lots on St. Simons Island without an appraisal in the file. We also funded $1.5 million in construction proceeds without performing inspections."

- The Bank had still not implemented loan stratification reporting to enable the Board to "develop proper guidelines and concentration limits for CRE."

66.     Despite the regulatory and internal warnings, the Board did not limit new CRE lending or take any action to reduce or mitigate risks from its CRE loan concentrations.  To the contrary, in 2007 the Bank added $76.5 million in CRE loans to its portfolio, including several of the Loss Transactions identified below.

67.     Over the next year, the Defendants failed to address the issues identified by banking regulators.  In connection with the exam of Darby commenced on May 27, 2008, the regulators downgraded the Bank's CAMELS rating for "Asset Quality" from 3 to 4.  An asset "4" rating indicates that the financial institution has deficient asset quality or credit administration practices, and that levels of risk and problem assets are significant, inadequately controlled, and expose the financial institution to potential losses that, if left unchecked, may threaten its viability.

68.     The examiners also downgraded the composite CAMELS rating from 2 to 3, finding, among other things, that the "risk management practices regarding asset quality have not kept pace" with the Bank's growth.

69.     In connection with an exit interview with bank regulators, and in advance of the issuance of the written examination report on or about August 21, 2008, defendant Bowden presented a memorandum to the Board on or about July

17, 2008, pertaining to the exam.  Bowden informed the Board that the regulatory

authorities had raised the following concerns and recommended corrective action:

> —deterioration in asset quality due to problem loan list of $61.5 million, which is 100% of bank capital plus ALLL.  If the number is over 40%, it is out of policy and the Bank should reduce the list to 25-30% of capital within 24-48 months
>
> —improve the loan grading system and correct errors in the construction loan process
>
> —management rated "3" due to asset quality.  Board to participate in a discussion on staff and structure, scheduled for July 29
>
> — capital level is inadequate given the asset quality.  Bank needs to bring in more capital.  Bank is also lowering loan levels until asset quality improves
>
> —lead examiner's recommendations to follow in a Memorandum of Understanding

70.    The 2008 report noted a high volume of adversely classified assets,

which had increased 157 percent since the previous examination.  It also noted that

critical credit documents were missing from loan files and that loans comprising 54

percent of the Bank's total risk-based capital violated LTV ratio limits.  Noting

that the Board and management had not taken action to address prior warnings

regarding the lending and credit administration problems at the Bank, the

examiners stated that Darby now faced greatly increased levels of problem assets

and high loan losses.

71.     The examiners also discovered that the Bank had made at least 18 loans, totaling approximately $50 million, which included interest reserves. Contrary to the requirements of the *Interagency Guidelines for Real Estate Lending Policies*, 12 C.F.R. Part 365, the Bank's Loan Policy respecting the underwriting of development and construction loans contained no standards for the acceptability of and limits on the use of interest reserves, which may conceal a borrower's inability or unwillingness to repay the loan.

72.     Despite the findings and conclusions from the May 2008 examination that were reported to them, including Darby's regulatory downgrade to a composite CAMELS 3 rating, many of the Defendants continued to approve and/or permit additional CRE loans with significant underwriting deficiencies, including several of the Loss Transactions identified below.

73.     The Board should have stopped or at least greatly curtailed further CRE lending no later than July 17, 2008, the date the Board learned the results of the recently concluded regulatory examination.

### (iii)    Defendants Ignored Repeated Warnings to Implement an Independent Loan Review Function.

74.     As early as the 2005 regulatory examination of the Bank and during all times relevant to the claims asserted herein, regulators clearly and specifically admonished the Board and management to implement an independent reporting

system for the Loan Review program. Internal Loan Review was a critical control and management tool, the purpose of which was to objectively evaluate the quality and collectability of loans. Such evaluations were essential to identifying problems in the loan portfolio, including evaluation of borrowers' ability and willingness to pay, collateral values, documentation weaknesses, collectability issues, and assessing the adequacy of the ALLL, including identification of impaired loans, among other things.

75.    In Financial Institution Letter (FIL) 105-2006, issued in final form on December 13, 2006, *Interagency Policy Statement on the Allowance for Loan and Lease Losses,* the FDIC and other federal banking regulators provided extended guidance on the nature and purpose of an independent loan review function, emphasizing that loan review must be independent from and not controlled by a bank's credit approval processes.

76.    In *every* report of examination from 2005 through 2008, the regulators criticized the Bank's internal Loan Review function. In the 2005 Report, bank examiners advised the Board that the Bank's "internal loan review function needs to be strengthened," noting that only three of the loans classified as adverse by the bank examiners had been previously identified by internal Loan Review, and that

"[s]everal downgrades from Pass to Watch to adversely classified loans occurred during the [FDIC's] examination."

77.    Beginning in the 2006 Report, and in every supervisory examination thereafter through 2008, regulators found that the internal Loan Review function lacked independence, because it reported directly to CLO Banks, who supervised Loan Review staff. The regulators repeatedly advised the Board to correct this weakness by requiring Loan Review to report directly to the Board or a committee thereof.

78.    In the 2007 Report, the examiners clearly explained both the significance of the independence requirement and the consequences of failure to respect it, warning the Board:

(a)    Internal Loan Review staff failed properly to identify problem loans. Internal Loan Review missed 75 percent of the large loans adversely classified by the examiners. Proper classification of problem loans was the first step in identifying lending problems and improving asset quality.

(b)    The Bank had not corrected the weaknesses concerning Loan Review noted in prior year examinations, including the recommendation that the internal Loan Review department report to the Board of Directors or an assigned committee, instead of to CLO Banks. The Board needed to increase the

independence of the loan review process and ensure accurate grading of the loan review portfolio, especially given internal Loan Review's failure to identify the large majority of problem loans.

79.    Despite the foregoing, the Board made no changes in the organization of the Loan Review function during the period in which Defendants recommended, approved and/or permitted the Loss Transactions, until August 2008.   On the contrary, the revised Loan Policy, approved by the Board on February 21, 2008, stated that Loan Review was still under the direct supervision of the chief credit officer, who was Defendant Banks.

80.    In connection with the 2008 examination, the regulators found that the Board had continued to disregard its strong admonitions respecting internal Loan Review.   Once again, examiners discovered a large volume (34 percent) of classified loans that had not been identified by internal Loan Review.   The examiners noted, moreover, that the Board was actually intending to reduce the level of review of loans in two counties with large loan concentrations, rather than expanding review as it should have done in light of the economic downturn and increase in adversely classified assets.

(iv)        **In Response to Mounting Warning Signs, Defendants Significantly Reduced Board Oversight of Lending.**

81.    The Loan Policy relevant to the FDIC-R's claims was initially approved by Darby's Board on April 28, 2006.  The Board further revised the Loan Policy on March 15, 2007, February 21, 2008, and January 28, 2010.  Some of the pertinent provisions pertaining to underwriting were amended in 2008 and 2010.

82.    The Loan Policy initially required the DLC to approve all loans greater than $500,000.  On March 15, 2007, however, the Board voted to change lending authority amounts.  It delegated authority to the OLCs to approve loans up to $2 million.  It also granted CEO Bowden and SVP Banks the authority to approve loans up to $1 million.  Several individual loan officers also had authority to approve loans up to specified levels not in excess of $1 million.

83.    At the time they approved the increase in lending authority to the OLCs, thereby eliminating the DLC's participation in the approval of loans under $2 million—which, categorically, included the majority of the Bank's individual CRE and ADC loans—the Defendants knew or should have known, as documented in the 2004, 2005 and 2006 Reports, that Darby had numerous uncorrected weaknesses in its loan underwriting; that it had continued to expand its high-risk over-concentration in CRE and ADC loans; that loans files were missing large volumes of critical documents bearing on borrowers' ability to pay and collateral

values; and that the internal Loan Review function was under CLO Bank's control, was not independent, and therefore was not reliable.

84.     The Board significantly withdrew from oversight of the Bank's lending function through the DLC, despite a duty to increase its oversight given the mounting problems and evidence of fundamental and widespread weaknesses threatening the Bank's safety.

85.     Subsequent to the Board's decision to reduce its oversight of the lending function, the OLCs and/or individual loans officers approved numerous Loss Transactions that exceeded $5 million.

86.     Consistent with the foregoing behavior, Defendant R. Williams admitted in testimony that the Darby Board abdicated its fiduciary responsibilities. According to R. Williams, the Board "let the bank run itself and we met with Chris Banks...the chief credit and loan officer....[W]e told him, Chris, we want you to do what is correct and if there is ever a problem, you come to us and we'll talk about it but we never heard a word ...[u]ntil towards the end."

(v)     **Despite Repeated Regulatory Warnings, the Board Failed to Correct its Defective Loan Approval Process.**

87.     Under Darby's Loan Policy, loan officers were required to prepare a "loan approval form" (hereinafter, "credit memorandum" or "credit request") for all loans above a lender's loan authority.  The information required on the credit

memorandum included, among other things, a description of the purpose of the loan, loan amount and terms, collateral description and value, whether an appraisal had been obtained, the loan-to-value ratio, a summary of the borrower's existing debt with Darby, key financial information on the borrower and any guarantors, an analysis of the borrower's cash flow and ability to service the debt, the loan officer's assessment, and any Loan Policy exceptions and the reasons therefore.

88.     All real estate loans were required to be supported by the proper documentation, including the application form, appraisal or statement of valuation, credit reports, and financial statements, and such documentation was to be maintained in the loan file.

89.     All DLC members, OLC members, and individual loan officers had access to credit memoranda *and* any required supporting documentation, including appraisals, financial statements, tax returns, project studies, and other required documents.

90.     In connection with DLC meetings, however, the members typically received only the credit memoranda.   The DLC did not receive, nor did they require loan officers to submit, relevant supporting documents, such as financial statements, credit reports, appraisals, or any other documents.   As a matter of routine, DLC members did not review underlying or supporting documents.

91.   The DLC's practice of looking only at the credit memorandum, a summary document, and not requiring more comprehensive underwriting information in loan review requests, evinced utter disregard for regulators' constant criticism that loan files did not contain large numbers of documents material to borrowers' ability and willingness to repay, collateral values, loan purposes, project plans and support, and other critical underwriting information.

(a)   In the 2005 report, the regulators advised the Board: "Numerous [loan] files lacked complete, current financial documentation.... [T]hese items need to be collected in a timelier manner in order to serve their purpose and to comply with the bank's loan policy.  This deficiency was noted at the previous State examination and in the 2004 external audit."

(b)   In the 2006 report, the bank regulators found that over $81 million in loans were missing credit or collateral documentation, and emphasized that "missing documentation may be a sign of a weak credit."  The examiners concluded that the "volume of loans with missing or inadequate credit or collateral documentation ... is unacceptable."

(c)   In the 2007 report, the regulators found:  "The volume of loan documentation exceptions is too high.  Technical exceptions of $76 [million] equal 58 percent of the loans reviewed at the examination.  Problems with technical

exceptions have been noted at the last three regulatory examinations…. Technical exceptions have adversely impacted credit quality. Improvement in this area should be a priority item."

92.     Notwithstanding the foregoing warnings, including the explicit alert that "missing documentation may be a sign of a weak credit," the DLC continued to approve loans, including Loss Transactions, based on the loan officer's summaries in the credit memoranda, without examining or ensuring the existence of necessary supporting documentation.

      **(vi)**        **Defendants Continued to Approve or Permit Violations of SLTV and Loan Policy LTV Ratios Despite Annual Warnings from Examiners.**

93.     The Board was also advised by regulators, repeatedly, that numerous CRE loans violated SLTV ratios, and that these exceptions had not been properly identified or documented. The 2006 report of examination bluntly advised the Board that management had not been adhering to its Loan Policy and the *Interagency Guidelines for Real Estate Lending Policies* regarding real estate loan-to-value guidelines; that the borrowers in many CRE loans had very little equity in the collateral; and that SLTV ratio exceptions were not being identified. It warned: "If a downturn in the real estate market did occur, it is probable that the Adverse

Items Coverage Ratio [adversely classified loans as a percentage or Tier 1 capital + ALLL] would increase."

94.     As reported in the 2007 report, the Bank's volume of loans in excess of SLTV ratio limits had continued to grow, even as the Bank failed to identify numerous additional loans in violation of the limits.  At the 2007 examination, the Bank's list of SLTV ratio exceptions (totaling $23.4 million) *omitted* 17 CRE loans ($15.9 million) with SLTV ratios in excess of applicable limits.  With inclusion of the omitted non-compliant loans discovered by the examiners, Darby's total commercial SLTV exceptions of approximately $40 million constituted 66 percent of total risk-based capital.  This circumstance also violated *Interagency Guidelines for Real Estate Lending Policies*, 12 C.F.R. Part 365, Appendix A, which capped the total dollar volume of CRE loans with SLTV exceptions at 30 percent of total capital.

95.     As reported in the 2008 Report, the Bank continued to violate SLTV limits for CRE loans under Part 365, which by that time constituted 54 percent of total risk-based capital, well in excess of the 30 percent cap.

> **(vii)     Defendants Improperly Renewed and Extended Problem Loans.**

96.     Accurate records of loan portfolio performance, including whether and to what extent loans were past due, were critical to an informed understanding

of the amount of capital that the Bank had available to loan and the degree of risk that could be tolerated in making loans.  Among other things, such records were essential to determining the provisions necessary to maintain an adequate ALLL. In part to ensure accurate records of loan performance, the Bank's Loan Policy provided that loan "renewals should not be used to conceal problems with credit quality" and that "[e]xtensions of loan payments shall not be used as a method of violating the principle of timely repayment."

97.    Notwithstanding principles of safe and sound lending and the Loan Policy's prohibition on improper loan renewals and extensions, Defendant DLC and OLC members repeatedly "renewed" and/or "extended" non-performing and other problem CRE and ADC loans, including several of the Loss Transactions, despite circumstances demonstrating doubtful collectability, and without demanding new and/or additional collateral.  CRE and ADC loans frequently were renewed without any underwriting or any adequate underwriting, including obtaining and reviewing up-to-date borrower financial statements and tax returns or collateral appraisals.  In so doing, Defendant DLC and OLC members were negligent, grossly negligent, and breached their fiduciary duties by approving such "renewals" and/or "extensions."

98.     Moreover, in approving new CRE and ADC loans, Defendants knew or reasonably should have known that the Bank's non-performing or problem CRE and ADC loans were far greater than reflected in the Bank's Call Reports and its books and records and that its ALLL was materially understated, therefore further militating against approving new, high risk and/or speculative CRE and ADC loans.

**(viii)     Darby's Loan Policy and Lending Authorities.**

99.     As its first general consideration, the Bank's Loan Policy stated that, to "ensure the continuation of safe and sound operation of the Bank, we have established the following objectives: 1. To grant loans on a sound and collectible basis for the protection of depositors."

100.    Under the Policy, CRE lending decisions required an analysis of a borrower's financial condition, capacity to repay, character, credit record, net worth, and collateral value.

101.    The Loan Policy set forth specific underwriting requirements for CRE and ADC loans. Plans, specifications, and proposed budgets were to be reviewed to determine if a project was feasible. ADC loans were to be properly structured and adequately secured, with takeout commitments or repayment plans in place.

Borrowers were required to have a well-defined capacity to repay the loans and to have equity in the project.

102.   The Loan Policy provided, among other things:

(a)   Current financial statements were required for all commercial borrowers with aggregate debt greater than $50,000, and tax returns were required for debt in excess of $250,000.   Corporate debt guaranteed by individuals also required the guarantors' current financial statement.   All personal financial statements required a signature.   All business loans or lines of credit greater than $250,000 required tax returns.

(b)   The Policy admonished against loans to a poor credit risk borrower "solely on the strength of the endorser or guarantor.  If the creditworthiness of the applicant is unsatisfactory, availability of an endorser or guarantor should not be enough to convince the lender to make the loan.  Prior to accepting an endorsement or guarantee, the lender must determine that he is fully prepared and capable of calling on the endorser or guarantor for payment."

(c)   CRE lending was to be based on an analysis of capacity to repay, character and credit record of the borrower, net worth of the borrower, value of collateral, and the condition of the borrower. Under the Policy, the "borrower *must have sufficient income* to service fixed obligations [i.e., 'debt-to-income' ratio or

'DTI']. As a rule, no more than 45% of net income can be used for fixed obligations, including the proposed payment" (emphasis added). A borrower's "equity in his assets is a secondary source of repayment that can be considered for collateralizing loans." Under the Policy, collateral value "shall not take precedence over the adequate assessment of the prospective borrower's ability to repay the loan."

(d)  The Policy's loan-to-value requirements tracked the supervisory limits in 12 C.F.R Part 365, Appendix A. As to "land development" loans, the Policy stipulated that land development included improved land loans and multiple-phase real estate loans. "However, if there have been minimal improvements to the land and the time frame for construction of the dwelling or building has not been scheduled to commence in the foreseeable future, the loan should generally be considered a raw land loan with a 65% supervisory LTV." Under Part 365, Appendix A, "for loans to purchase an existing property, the term 'value' means the lesser of the actual acquisition cost or the estimate of value."

(e)  Darby's Policy recognized that "construction lending presents inherent risks that are best addressed by experienced lenders and staff." In light of that risk, the Policy stated that, "[i]n addition to analysis of the borrower, guarantors, and the collateral, the lender must also perform a thorough analysis of

the project, the contractor, and the market." The Policy further stated: "Risk mitigation is the key to construction lending in both consumer and commercial projects.... Basic criteria to address in the credit decision[] include: [1] Project Economics feasibility...review of the plans and specs, review of the construction contract, receipt of the project budget... [2] Loan [properly] structured [and] adequately secured with take-out commitment or repayment plan identified... [3] Borrower known to the Bank, well-defined capacity to repay, reflecting hard equity in the project." In addition, "[r]eal estate construction loans should not exceed the expiration date of permanent loan take-out commitments. Original maturities should be limited to 12 months if possible."

(f)     All credit requests involving a real estate transaction required an appraisal or evaluation. Appraisals were to be performed by qualified independent appraisers for CRE loans above $250,000. In addition, "[d]isbursal of loan proceeds will not be made until completion of the appraisal process." Reappraisals were required when the general market value of property in the area declined by more than ten percent over the preceding twelve months. It was the Bank's "policy to obtain accurate appraisals in accordance with 12 CFR Part 323 of the FDIC's Rules and Regulations." External (or "fee") appraisers "must be engaged directly by the Bank."

(g)    On-site inspections were required prior to disbursement of construction draws, to verify completion of work, and the inspection report was to be in writing.

(h)    The Policy's loan review requirements included a nine-level grading hierarchy, from "Excellent" at Grade 1 to "Loss" at Grade 9. The common characteristics of substandard loans (Grade 7) included, among other things, insufficient cash flows to meet scheduled obligations, questionable financial strength of guarantors, and/or repayment was likely to come from liquidation of the collateral or payments from guarantors.

(i)    The Policy identified several types of loans deemed "undesirable," including any "loan where the sources and timing or repayment are not clearly defined."

103.   The DLC maintained weekly minutes of decisions reflecting the members present, all loans approved, the identity of those who voted against approval or who abstained, if any, and summaries of the basic terms of each loan.

104.   CLO Banks presented finalized minutes for each DLC meeting at the monthly Board meeting and provided directors with an opportunity to question any DLC lending decision. Monthly board packages also listed all loans newly approved by the OLC and individual loan officers.

105.   The Loan Policy in force during the relevant time delegated authority to approve loans to the DLC, two OLCs, and individual lenders.   The DLC consisted of at least six non-officer directors and the CLO.   The OLCs each consisted of two loan officers and one DLC member.

**B.**     **The Loss Transactions.**

106.   In connection with the Loss Transactions, Defendants were negligent and grossly negligent and breached their fiduciary duties, violating the Bank's Loan Policy, applicable rules and regulations, and prudent banking practices. Attached to this Complaint as exhibit A is a chart that identifies the Loss Transactions by borrower, approval date, loan amount, losses incurred to date, and the Defendants who approved or recommended the loans.

107.   With regard to the Loss Transactions, the information provided to the DLC and/or OLC members, including the credit memoranda, showed that the proposed loans violated the Bank's Loan Policy, regulatory laws, regulations and standards, and principles of prudent lending, and/or manifestly were insufficient to support any informed or reasonable decision to approve the proposed loans.

**Loan No. 1:  RG**

108.  Based on a credit memorandum dated November 8, 2006, the DLC approved a loan of $1,890,000 to the borrower, "**RG**,"[2] which was funded on November 17, 2006.  The purpose of the loan was to provide 100 percent financing to purchase ($1.35 million) and develop ($540,000) six to eight lots for residential construction on Wilmington Island near Savannah.  The loan was for 12 months, with monthly interest-only payments.

109.  DLC members Bowden, Banks, Davis, Estroff, Tyson, R.A. Williams, C. Williams and R.D. Williams voted to approve the loan, notwithstanding at least the following manifest violations of prudent lending principles and material requirements of the Bank's Loan Policy:

(a)    The borrower, who already owed Darby $1 million and had guaranteed over $4 million in other debt, had a well-known bad credit record with Darby.   The credit memo acknowledged **RG**'s "prior poor performance," "uncertainty of income stream" and "poor credit history."

---

[2]    The names of individuals, including borrowers, entity principals, and guarantors, have been withheld to protect personally identifiable information.

(b)    The credit memo explained that the loan request was motivated in the hope that "profit from this project will clear up all of [**RG's**] old 'problem' debt" from 2001.

(c)    The borrower had no capacity to repay.   Annual income was approximately $263,000.  The borrower had $30,000 in liquid assets and a Beacon Score of 536, considered subprime.

(d)    The proposed loan did not require the borrower to have any equity in the property.

(e)    There was no guarantor.

(f)    The "repayment plan" consisted of speculative lots sales at a range of $395,000 to $800,000 per lot.  The borrower had no pre-sales, take-out refinancing, or other identifiable sources of repayment.  The credit memorandum contained no market analysis.

(g)    The request included no specific development plans, specifications, completion milestones, or cost breakdowns.  No construction was scheduled to begin in the foreseeable future.

(h)    Darby held a first lien position on the subject property, independently valued "as completed" at $2.8 million.  Based on those values, the credit memo calculated an LTV ratio of 71 percent.  Under Darby's Loan Policy, however, the

loan should have been considered a raw land loan, subject to a limit of 65 percent of cost. The cost of the land was $1.35 million, and therefore the loan should not have exceeded $877,500. Instead, the DLC approved the loan at 140 percent of cost, violating federal regulations and the Bank's Loan Policy.

(i)     Despite lack of progress, the DLC renewed the loan in June 2007 and again in November 2007, the latter for one year.

(j)     Despite continued lack of progress or improvement in repayment prospects, in March 2008, the DLC approved another extension *and* an increase to $2,005,000, purportedly to cover changes in county water and sewer requirements. The DLC also failed to obtain any update on the November 2006 appraisal.

110. **RG** did not sell a single lot. Following foreclosure, Darby lost $1,094,872.23. An October 2009 charge-off request observed: "We should be very cautious and conservative extending credit for any reason to borrowers whose primary source of repayment is income that is uncertain and unpredictable, regardless of collateral values."

111. Defendants Bowden, Banks, Davis, Estroff, Tyson, R.A. Williams, C. Williams and R.D. Williams acted negligently, grossly negligently, and in breach of their fiduciary duties to Darby in making and/or approving the foregoing loan, causing the Bank damages.

**Loan No. 2:  134 Whitaker, LLC**

112.   Based on a credit memorandum dated November 15, 2006, the DLC approved $582,000 in "additional funding" to complete construction work in a vacant three-story commercial building in downtown Savannah that the borrower planned to convert to condominiums for sale.  This loan was taken out separately from an existing $2 million speculative construction loan to the borrower for the same project.

113.   DLC members Banks, Bowden, Davis, Estroff, Tyson, R.A. Williams, C. Williams and R.D. Williams approved the request, notwithstanding at least the following manifest violations of prudent lending principles and material requirements of the Bank's Loan Policy:

(a)    The credit memorandum did not describe or refer to any construction contract, plans, specifications, or itemized project costs.

(b)    The borrower and guarantor, "**VG**," lacked the capacity to repay.  The credit memorandum contained no financial information on the borrower.  The guarantor, the borrower's principal, reported $20,500 in liquid assets.   The credit request contained no cash flow analysis.

(c)    The credit request did not discuss any repayment plan.  Its "repayment sources" schedule provided financial information for a non-guarantor restaurant

owned by **VG,** also indebted to Darby. The restaurant debt was not included in the total relationship debt nor was it included in any global cash flow analysis (as there was none). The restaurant schedule reflected $22,000 in liquid assets.

(d)    Although repayment depended on condominium sales, the borrower had no pre-sales and no other refinancing or take-out commitments in place. The request contained *no* analysis of the Savannah condominium market, much less the thorough analysis required under the Loan Policy.

114.    The Bank renewed the loans on several occasions. According to a renewal request in December 2008, the loans were made for the purpose of acquiring the building at 134 Whitaker and converting it from commercial use to condominiums, but the borrower "changed his plans several times during the course of the project."

115.    By February 2009, the Bank had transferred the 134 Whitaker debt to its non-accrual account for loans more than ninety days past due. On December 29, 2009, the Bank charged off $194,939 advanced on the line approved in November 2006. It later foreclosed on the property and reduced the recorded value of the entire debt to $1.8 million.

116.    Defendants Banks, Bowden, Davis, Estroff, Tyson, R.A. Williams, C. Williams and R.D. Williams acted negligently, grossly negligently, and in breach

of their fiduciary duties to Darby in making and/or approving the foregoing loan, causing the Bank damages.

**Loan No. 3: Flint River Transportation**

117.  By credit memo dated January 10, 2007, the DLC was asked to approve a loan to a trucking company in the amount of $2,150,536.  The stated purpose of the loan was to renew and restructure existing debt to extend the due date by three years.  In addition, the loan would advance $300,000 for "working capital" for "shutting down the business and moving [the] equipment and accounts to another trucking company."  The terms provided for monthly interest only payments for the first four months to be followed by monthly principal reduction payments of $10,000.  Flint River's principal, "CW," a former member of Darby's Board of Directors, provided an unsecured personal guarantee.

118.  Defendants Banks, Davis, Tyson, C. Williams, R.A. Williams, and R.D. Williams approved the foregoing loan, notwithstanding at least the following manifest violations of prudent lending principles and material requirements of the Bank's Loan Policy:

(a)  The borrower and guarantor did not have the ability to repay the loan. The credit memo did not purport to analyze repayment capacity based on financial statements and tax returns, as mandated by the Loan Policy.  The credit request did

not include any statement or summary of Flint River's balance sheet or income statement or any cash flow analysis.

(b)   The credit memo stated that the total debt relationship with **CW** violated the Bank's internal lending limit for loans and other obligations due from a borrower. It also reported an LTV ratio of 111 percent, and stated that the loan violated applicable LTV ratio limits. The DLC minutes of approval of the loan do not document any regulatory or policy exceptions or indicate that there had been any questions or discussions about them.

(c)   The collateral, which had already been pledged for the renewed loan amount, consisted of company trailers, tractors, accounts receivables, and a second mortgage on condominium property. The stated aggregate value of $1.2 million reflected estimates by the loan officer and the borrower, and a year-old appraisal of the real estate, and was therefore not reliable. There was no evidence presented to the DLC that the equipment had even been inspected and verified to exist. The credit memo stated as a 'weakness" the "nature of the collateral and lack of repayment source."

(d)   According to the credit memo **CW** planned to pay off $480,000 of the $2.1 million debt by accounts receivable collections and selling some of the trailers

over the ensuing three years.  In other words, the credit memo admitted that the borrower was not willing or able to pay the debt at maturity.

(e)   The borrower was in default no later than early September 2007 and thereafter ceased making any payments under the note.  In December 2008, the Bank recorded a loss of $1.4 million of the debt.  In April 2009, it determined that the "trucking collateral," which Darby had repossessed, was worthless.   The Bank's losses also included at least $264,763 on the $300,000 advanced in January 2007.

(f)   Defendants Banks, Davis, Tyson, C. Williams, R.A. Williams, and R.D. Williams were negligent, grossly negligent, and breached their fiduciary duties to Darby by making the foregoing loan, causing the Bank damages.

**Loan No. 4: Castle Home Builders, Inc.**

119.  On or about September 27, 2006, DLC member Defendants Banks, Bowden, Bedingfield, Davis, R.A. Williams, C. Williams, and R.D. Williams unanimously approved a loan of $1,225,000 to Castle Home Builders, Inc., of Hinsdale, Illinois ("Castle Home") (hereinafter, the "initial loan").  On March 21, 2007, DLC member Defendants Banks, Bedingfield, Bowden, Davis, R.A. Williams, C. Williams, and R.D. Williams voted unanimously to renew the initial loan and increase the loan amount by $2.075 million, for a total of $3.3 million

(the "renewal loan").  On November 14, 2007, the same DLC committee members who approved the renewal loan voted to approve a second renewal and increase the loan amount by another $250,000 for a total of $3,500,000 (the "second renewal loan").

*Castle Home Initial Loan*

120.   According to a credit memorandum dated September 27, 2006, Castle Home, an entity owned by the proposed loan's unsecured guarantor, "**TJL**," sought to borrow $1.225 million, or 100 percent of the purchase price, to acquire a historic eight-bedroom house, located on East Taylor Street in Savannah, Georgia, to convert into luxury rental property.

121.   The DLC approved the request, notwithstanding at least the following manifest violations of prudent lending principles and material requirements of the Bank's Loan Policy:

(a)    The credit memorandum did not suggest any repayment plan.  On the contrary, it was explicit that the loan would be used to acquire the property, with any repayment contingent on rental operations *after* unspecified but significant additional future Bank construction financing.  It stated that, at some unspecified future time, the loan officer "will come back to request funds to do this project," and that the "project for *this request* will take 2 years to complete" (emphasis

added).   The DLC was given no specific project-related schedule, plans, or estimates.

(b)   Neither Castle Home nor **TJL** were viable sources of repayment. **TJL** had total liquid assets of only $380,000 (with $100,000 in gross annual income) and unsecured personal guaranties on $1.6 million in other Castle Home debt to the Bank.   Castle Home had a 2005 net loss of <$194,011> and an accumulated deficit of <$533,632>.   With the proposed loan, Castle Home would have negative cash flow and a 0.63 debt service coverage ratio ("DSCR")—that is, only 63 cents of available cash to pay for every dollar of debt service.

(c)   Castle Home had no equity in the property.

(d)   The loan had an LTV ratio of 86 percent, in violation of the 80 percent SLTV and Bank Loan Policy limit.

*Castle Home Renewal Loan*

122.   By credit memorandum dated March 21, 2007, the loan officer sought to renew and increase the loan to $3,250,000, with a term of 18 months with interest-only payments.   The $2,025,000 increase was for construction work, comprised of $1,473,322 for main house improvements, $205,877 for "carriage house" improvements, and $354,000 for "contingency."

123.   The DLC approved the renewal, notwithstanding at least the following manifest violations of prudent lending principles and material requirements of the Bank's Loan Policy:

(a)   The credit memorandum showed that the likelihood that the Bank would be repaid was speculative and remote.  The request indicated that to recover the proposed loan, the Bank would need to reduce its investment to 65 percent. Accordingly, the Bank was "*asking* the borrower to inject approximately $1,000,000 into the project prior to completion" (emphasis added), which could only be done by raising the money through sales of other real estate.   The borrower, however, had no contractual obligation to inject $1,000,000; had no present ability to do so; had not marketed any other properties; and had not even identified which property could be sold.

(b)   Neither Castle Home nor **TJL** constituted a reasonable source of repayment.  According to the credit memorandum, as of September 30, 2006, Castle Home had $3,162 in year-to-date net income, $380,000 in liquid assets, and an accumulated deficit of <$529,452>. The guarantor's financial condition also had weakened since the initial loan.

(c)   The amount loaned for construction/remodeling costs lacked any reliable or specific support or analysis.

(d)    Castle Home had no equity in the property.

(e)    The increased loan violated Bank Policy and SLTV ratio requirements. The credit request stated an "as completed" value of $3.25 million, based on a pending appraisal and arbitrary discounts made by the loan officer. Even with this unsupported value, the LTV ratio, at best, was 94.4 percent, exceeding the required 80 percent SLTV and Bank Loan Policy ratio. There were no stated mitigating circumstances.

124.   The loan officer later admitted that the "East Taylor Street debt service is simply too high for the business to support at less than optimal occupancy." Castle Home was unable to sell the property and the loan defaulted, causing Darby to write off $1,005,985.07 of the loan on August 19, 2009. The FDIC incurred $736,643 in additional losses for a total loss of $1,742,628 on the loan.

125.   Defendants Banks, Bowden, Bedingfield, Davis, R.A. Williams, C. Williams, and R.D. Williams acted negligently, grossly negligently, and in breach of their fiduciary duties to Darby in making and/or approving the foregoing loan, causing the damages.

**Loan no. 5:  V&W Properties, LLC**

126.  By credit memo dated February 7, 2007, the DLC was asked to approve a $941,000 commercial line of credit for the construction of four townhomes in Savannah for V&W Properties, LLC, an entity formed for the purpose of the project.  The loan was due in full in 12 months, with monthly interest-only payments.

127.  DLC members Bowden, Banks, Davis, Estroff, Tyson, C. Williams, R.A. Williams, and R.D. Williams voted to approve the loan, notwithstanding at least the following manifest violations of prudent lending principles and material requirements of the Bank's Loan Policy:

(a)    The borrower and the two individual guarantors, the borrower's members, lacked the capacity to repay.  The credit request contained no financial information on the borrower, despite the fact that it had apparently paid $230,000 in cash to purchase the lot.  The guarantors, who had a combined debt relationship with Darby of $1,617,003 from several other CRE project loans, had an aggregate of $310,000 in liquid assets.  The request omitted required financial data, including current personal financial statement information or any cash flow analysis for the borrower or the guarantors.

(b)     Loan repayment depended on sale of the completed property.  The credit memorandum identified the project's speculative nature as a weakness.

(c)     The credit request contained no timetable for construction or marketing of the units.  It similarly lacked any discussion or analysis of construction costs, project plans, or the market and sales prospects for the contemplated townhouses.  The borrower did not purport to have any pre-sales or other purchase commitments.

(d)     The credit memo stated that collateral had been appraised "As Is" for $230,000 and "As Completed" at $1,270,000.  Based on the "as completed" value, the credit request calculated a 72 percent LTV.  Given the lack of improvements to the property or any schedule to commence construction in the foreseeable future, however, the loan should have been considered a raw land loan, subject to a supervisory LTV ratio limit of 65 percent of cost, or $149,500.   As approved by the DLC, the loan reflected 409 percent of cost.

(e)     The Bank twice extended the loan for twelve months, in April 2008 and May 2009, on the latter occasion by Defendants Banks and Thompson.  In extending the loan, the Bank did not obtain any updated appraisal, despite the manifest material loss in market value of the property.

128.   In June 2010, Darby recorded a loss on the loan of $473,388.

129.   Defendants Banks, Bowden, Davis, Estroff, Tyson, R.A. Williams, C. Williams, and R.D. Williams acted negligently, grossly negligently, and in breach of their fiduciary duties to Darby in making and/or approving the foregoing loan, causing the Bank damages.

**Loan No. 6:  34 East Broad, LLC**

130.   By credit memorandum dated March 5, 2007, a loan officer requested a $1,417,000 loan, due in one year, with interest paid monthly, for borrower 34 East Broad, LLC.  The purpose of the loan was to purchase ($1,280,000) and renovate ($400,000) a six-unit apartment building in Savannah to convert it to condominiums for sale.   According to the request, "**DLS**," a guarantor and principal of the borrower, was "a local appraiser [who] is very familiar with downtown Savannah and he does a lot of work for us."

131.   Defendant Banks, S. Coomer, and Thompson approved the request, notwithstanding at least the following manifest violations of prudent lending principles and material requirements of the Bank's Loan Policy:

(a)   The borrower had no equity in the property.

(b)   The borrower and guarantors lacked capacity to repay a $1.4 million loan in 12 months.  The borrower had no income.  **DLS** guarantor had 2006 income of $120,000, and $2,500 in liquid assets.  The other guarantor, **DLS**'s grandmother,

reported income from "government sources" and $19,000 in interest earnings on mortgages, with $413,400 in liquid assets. The credit request acknowledged that "cash flow was tight."

(c)     The credit memo stated an appraised "as completed" value of $2,175,000. An actual appraisal, dated March 9, 2007, however, valued the collateral "as completed" at only $1,762,000, based on projected sales of renovated condominium units, assuming marketability as of August 1, 2007.

(d)     Repayment depended on successful renovation, conversion, and sale of the units within a four-month time frame. The credit memorandum, however, provided no evidence of project support, cost analysis, a feasibility study, any marketing analysis, pre-sales, or any other purchase or refinance commitments. The $400,000 "renovation" costs lacked explanation or support.

132.   The renovation took a year longer than projected. When the borrower requested "renewal" for another year, the loan officer on August 18, 2008, noted in the credit memorandum that the renovation had "quickly turned into a major and complete renovation," and that she "was shocked at the need to more than double the initial cost projection."

133.  Darby recorded a loss of $890,000 on the loan in July 2010.  The charge-off request noted: "This project had no room for deviation from the original plan and was doomed from the moment cost and time overages began."

134.  Defendants Banks, S. Coomer, and Thompson acted negligently, grossly negligently, and in breach of their fiduciary duties to Darby in making and/or approving the foregoing loan, causing the Bank damages.

**Loan No. 7: Cumberland Square North Associates, LLC**

135.  On May 23, 2007, the DLC approved a $5.5 million, 12 month, interest-only loan to Cumberland Square North Associates ("Cumberland Square"), an out-of-territory borrower.  The credit request stated that the purpose was to pay off the borrower's $3 million loan from Columbia Bank & Trust ("Columbia B&T") secured by the property and use the additional $2.5 million for construction of a speculative luxury home on St. Simons Island, Georgia.

136.  Defendants Banks, Bowden, Davis, C. Williams, R.A. Williams and R.D. Williams voted in favor of the loan, notwithstanding at least the following manifest violations of prudent lending principles and material requirements of the Bank's Loan Policy:

(a)    Neither the borrower nor the guarantor, "**JV**," had any equity in the property.

(b)     The credit memorandum did not show how the loan would be repaid.  It contained no information on or analysis of Cumberland Square's finances or capacity to repay the loan.

(c)     The credit request stated that **JV** "expects the [contemplated spec home] to sell in the $5,500,000 to $6,000,000 range."  It did not claim that the borrower had any purchase or refinancing commitments or had received any expressions of interest.

(d)     The Bank had not received an appraisal.  The credit request stated that an appraisal with both "as is" and "after completion" valuations would be required "prior to any *construction* draws" (emphasis added).  The DLC approved the loan without stating any conditions to disbursement.  As a result, on May 25, 2007, Darby wired $3 million to pay Columbia B&T before receipt of any appraisal in violation of the Loan Policy, which prohibited loan disbursement without an appraisal.

(e)     The credit memo computed an 80 percent LTV ratio, which was within applicable limits, assuming the appraisal would support an "as completed" market value of $6.9 million.  The calculation was manifestly erroneous.  The property was unimproved and construction of the spec house had not been scheduled.  Under the Bank's Loan Policy, the loan should have been considered a raw land loan, limited

to 65 percent of cost. The borrower purchased the property for approximately $1,044,000. The DLC violated the Bank's Loan Policy and federal regulations by approving a raw land loan constituting 527 percent of land cost.

(f)    The Bank did not receive any appraisal until August 20, 2007, at which time the lots were appraised at an "as is" value of $4,400,000. The appraisal included no "as completed" value. By then, Darby had already disbursed over $4 million.

(g)    The Cumberland Square loan received extensive criticism in the FDIC's 2007 report of examination, which the Board received on September 27, 2007. The examiners summed up their findings by observing, among other things, that the guarantor lacked the willingness and/or ability to pay the debt and that the compiled financial statements did not verify the guarantor's financial condition. CLO Banks agreed with the examiners' conclusion that $4.4 million of the loan (100 percent of the appraised value) should be classified as "substandard," and that the remaining $275,000 already advanced should be written off. The FDIC noted that management had cancelled the unfunded portion.

(h)    In a memo to the Board dated October 15, 2007, Defendant Banks admitted, with regard to the Cumberland Square loan: "We funded approximately $3.5 million for the purchase of two lots on St. Simons Island without an appraisal in

file.   We also funded $1.5 million in construction proceeds without performing inspections.... [We have now] implemented a system of checks and balances to prevent future draws on construction loans without proper inspections."

(i)   Despite knowledge of the adverse history of the loan, on December 23, 2008, the DLC approved a loan increase of $517,500 in addition to the unrepaid $4 million to "cover remaining project hard costs."   According to the minutes, even though the guarantor purportedly had "great cash flows from his shopping centers," the house was only 40 percent complete.   The additional funds would allow completion of the property, which would give the borrower a "much better chance of selling it than in the current condition."   Defendants Banks, Bowden, A. Williams, C. Williams, R. Williams, and Davis approved the increase.

137.   The house was offered for sale but never sold.   The September 23, 2009 charge-off request stated: "The bank should not be making out-of-market spec home loans to out-of-market borrowers."   The final loss was approximately $2.495 million.

138.   Defendants Banks, Bowden, Davis, C. Williams, R.A. Williams and R.D. Williams acted negligently, grossly negligently, and in breach of their fiduciary duties to Darby in making and/or approving the foregoing loan, causing the Bank damages.

**Loan Nos. 8-9:  Henderson Property Holdings**

139.  In 2007, the DLC approved two $500,000 increases on a preexisting $4 million loan for a commercial development in Savannah, "Laurel Hill Village," to Henderson Property Holdings.  Defendants Banks, Bowden, Davis, C. Williams, R.A. Williams and R.D. Williams approved the June 6, 2007 increase ("June 2007 increase").  Defendants Banks, Bedingfield, Bowden, Davis, C. Williams, R.A. Williams, and R.D. Williams approved the November 20, 2007 increase ("November 2007 increase").

140.  The foregoing Defendants voted in favor of the increases, notwithstanding at least the following manifest violations of prudent lending principles and material requirements of the Bank's Loan Policy:

(a)      The Bank had no valid appraisal for the original $2 million loan in June 2005 and the $2 million increase in February 2006. The only appraisal, from June 2005, had been prepared for and addressed to Sea Island Bank, not Darby, in violation of the Loan Policy and regulatory requirements of 12 C.F.R. Part 323. Despite knowledge that the $2 million increase had been approved "subject to appraisal," and that no such appraisal had ever been obtained, the DLC approved the June 2007 increase, again "subject to appraisal."

(b)    The June 2007 credit memorandum, which stated that the increase was "to continue with development until units are leased and cash flowing," provided no reasonable or supported repayment plan.   It contained no financial information regarding Henderson Properties.  It concluded, with no support, that that there was sufficient cash flow to "carry the existing and requested increase."

(c)    The two guarantors, father and son real estate developers with numerous real estate projects, reported a collective $1.85 million in liquid assets, $1.5 million in personal debt, and $22.8 million in contingent liabilities for personal guarantees on other real estate projects.   The June 2007 credit request contained no information about their income and showed that the Bank had not obtained their tax returns.

(d)    The FDIC's report of examination sent to the Board on September 25, 2007, stated that the Henderson Property Holdings loan "illustrates several problems regarding loan underwriting and servicing practices.  An adequate appraisal is not in the file, resulting in an apparent violation of law.  Proper site inspections were not done.  The line was drawn well above the original plans for the debt and above the value of the appraisal in the file, yet a written explanation of the facts is not documented...."

(e)    Despite the examination report, the DLC approved the additional $500,000 increase on November 20, 2007, "to construct the 2nd building."  Once again, the credit request contained no financial information on the borrower, no cash flow analysis, no income information for the guarantors, and no discussion of whether and how the $5 million loan would be repaid by the (new) maturity date of November 2008.  In violation of the Loan Policy, the DLC renewed the loan solely on the strength of a recent appraised value of $6.655 million.

141.   With the loan past due, Darby asked the borrower in May 2009 to take steps to "have this loan moved out of Darby as soon as possible."  In November 2009, the collateral was re-appraised at $3.290 million. On or about June 30, 2010, Darby recorded a partial charge-off in the amount of $1.591 million.  The charge-off request noted: "We should avoid making loans to borrowers who have excess raw land to service debt on.   Underwriting should include a thorough understanding of borrowers' contingent liabilities and the performance of projects funded by others."

142.  Defendants Bowden, Banks, Davis, C. Williams, R.A. Williams and R.D. Williams acted negligently, grossly negligently, and in breach of their fiduciary duties to Darby in making and/or approving the June 2007 increase of the foregoing loan, causing the Bank damages.

143. Defendants Banks, Bedingfield, Bowden, Davis, C. Williams, R.A. Williams, and R.D. Williams acted negligently, grossly negligently, and in breach of their fiduciary duties to Darby in making and/or approving the November 2007 increase, causing the Bank damages.

**Loan No. 10:  RS**

144. By credit memorandum dated May 22, 2007, a loan officer requested a $720,000 line of credit for the borrowers, "**RS**" and spouse, to purchase and construct a speculative single-family residence on Dolphin Island near Midway, Georgia.  The request proposed a term of 12 months with monthly interest-only payments.

145. Defendants Banks, Thompson, and S. Coomer  approved the request, notwithstanding at least the following manifest violations of prudent lending principles and material requirements of the Bank's Loan Policy:

(a)      The credit request stated that "[r]epayment … will stem from resale of the house."  Contrary to the Loan Policy, the credit memorandum contained no information or discussion of the borrowers' income.  There was no calculation of the borrowers' debt-to-income ratio.  The request did not contain any cash flow analysis or employment information.

(b)      The borrowers had no equity in the property.

(c)    Despite the fact that the loan was collateral dependent, there were no purchase commitments, offers, or even expressions of interest.  The credit request stated no basis to support a judgment that the residence could be completed, marketed and sold within 12 months.  Further, although the request acknowledged that the loan amount fell $130,000 short of budgeted acquisition and construction costs, it provided no detail or description of estimated costs to complete or explain how the borrowers would pay for it.

146.    The loan matured in June 2008.  The Bank foreclosed on the property and transferred it to ORE in October 2008 with a balance of $360,000, incurring a loss of $290,506.06.  According to the charge-off request, the borrower could not service interest payments and had been unable to fund construction costs.  Darby disbursed an additional $116,803 to finish the house and sold it for $239,315.24, charging off an additional $237,487.76.  The Bank ultimately incurred a loss of $527,993.82.

147.    Defendants Banks, Thompson, and S. Coomer acted negligently, grossly negligently, and in breach of their fiduciary duties to Darby in making and/or approving the foregoing loan, causing the Bank damages.

**Loan No. 11:  NGL Investments, LLC**

148.  A credit memorandum, dated June 7, 2007, sought a $726,000 loan for NGL Investments, LLC for the acquisition and development of a 39-lot subdivision in Brooks County, Georgia, an out-of-territory loan.  The loan was for a 12-month line of credit with monthly interest-only payments.

149. On June 18, 2007, Defendant Banks approved the loan, notwithstanding at least the following manifest violations of prudent lending principles and material requirements of the Bank's Loan Policy:

(a)    The Bank had no prior relationship with the borrower and its guarantors.  The borrower initially had the A&D loan with another bank, which Darby paid off with the subject loan proceeds.  The credit memorandum did not document the reasons the borrower sought replacement credit from Darby.

(b)    Neither the borrower nor the three guarantors (the principals of the borrower) had the capacity to repay the loan.  For 2006, the borrower generated $55,000 in income and reported $42,000 in "liquid or current assets."  Collectively, the guarantors had $410,000 in liquid assets.

(c)    The credit memorandum left blank the line item for debt coverage ratio. When the loan was later renewed in July 2008, however, the request reported a

DSCR of 0.80, meaning that NGL did not generate enough cash to pay for its fixed debt obligations.

(d)     Although the credit memorandum identified the repayment sources as "primary: sale of lots; secondary: liquidation of collateral," the borrower had in-place no pre-sales, purchase commitments, or other identified repayment sources.

(e)     The credit memo contained no discussion of development plans beyond stating that the loan would fund the development of a subdivision of 39 residential lots.

(f)     The credit memorandum stated a loan-to-value ratio of 75 percent based on an "as developed" appraised value of $972,000.  Because no improvements to the land had been made and actual construction had not been scheduled within the foreseeable future, Darby's Loan Policy required the loan to be considered a raw land loan.  Under the Loan Policy and federal regulations, loans for raw land could not exceed 65 percent *of cost*.  The actual land cost, at most, was $600,000; thus, the loan limit was $390,000.  The $726,000 loan was far in excess of regulatory and Loan Policy limits.

150.   After Defendant Banks approved the loan, the borrower suspended work, unable to secure agreement by the county to pave the main road.  The borrower sold no lots.  On August 19, 2009, the DLC charged off $278,194.50.

The charge-off request conceded that "[t]he loan is over-advanced based on collateral. We funded soft costs with little, if any, improvement to our collateral." Darby ultimately incurred a loss of at least $320,243.35.

151. Defendant Banks acted negligently, grossly negligently, and in breach of his fiduciary duty to Darby in making and/or approving the foregoing loan, causing the Bank damages.

**Loan No. 12:  Lake Bowden, LLC**

152. A credit memorandum dated July 11, 2007, prepared by Defendant Harp, recommended a $1,000,000 loan to Lake Bowden, LLC with monthly interest-only payments and principal due on August 8, 2008. The loan, to finance the "pre-development" costs for an "age-targeted" community near Valdosta, was secured by 66.67 acres (of a 291 acre tract) with an appraised value of $1,333,400.

153. Defendants Banks and Harp approved the request, notwithstanding at least the following manifest violations of prudent lending principles and material requirements of the Bank's Loan Policy:

(a)    The October 2006 appraisal was prepared for and addressed to a different bank. Its use therefore violated 12 C.F.R. Part 323 and Darby's Loan Policy.

(b)     The credit memorandum incorrectly calculated a 75 percent loan-to-value ratio.  Because there were no improvements to the land and no construction scheduled to commence in the foreseeable future, the LTV ratio was limited to 65 percent of cost as a raw land loan under the Bank's policy.  As a result, the loan exceeded permissible limits by $350,000.   The Bank did not document the exception.

(c)     The borrower and sole guarantor did not have the capacity to repay the loan.  The borrower had no operations and only $100,000 in liquid assets.  The guarantor had only $45,000 in liquid assets and a subprime Beacon credit score of 592.  The credit memo contained no information on the guarantor's income.  In addition, the borrower had no experience with similar projects.

(d)     Only one of the two members of the LLC borrower would provide a guaranty, in violation of the Loan Policy.

(e)     The credit memorandum stated, without any support, that the borrower would repay the loan from the project.  No project plans existed.  The borrower had no commitments to finance any construction. There were no pre-sales or specified pre-sale prospects.

(f)     Before closing, the Bank received a title opinion from its attorney, documenting that the property was encumbered by two deeds to secure debt, one to the previous land owner and the other to the second member of the borrower.

(g)     The Bank did not monitor disbursements. Disbursements were improperly used to pay off the existing liens. Darby also paid out $320,964.53 to the guarantor and related companies for improvements to the property, even though no work had been done.

154.   In September 2009, following foreclosure, the Bank recorded a charge-off of $698,662.51 on the loan. The property was later sold at an additional $19,958.99 loss, for a total loss of $718,621.50.

155.   Defendants Banks and Harp acted negligently, grossly negligently, and in breach of their fiduciary duties to Darby in making and/or approving the foregoing loan, causing the Bank damages.

**Loan No. 13: HR**

156.   According to a credit memorandum dated April 25, 2007, the borrower, "**HR**," an individual who resided in North Carolina, requested a $692,000 speculative acquisition and construction loan to purchase and renovate two condominiums in Drayton Towers ("Towers"), a nine-story mixed-use

building in Savannah.   The loan was due in 12 months and had monthly interest only payments.

157. Defendants S. Coomer and Thompson approved the loan, notwithstanding at least the following manifest violations of prudent lending principles and material requirements of the Bank's Loan Policy:

(a)     The borrower and guarantor did not have the ability to repay the loan. The credit memo did not purport to analyze repayment capacity based on financial statements and tax returns, as mandated by the Loan Policy.

(b)     The borrower put no cash equity into the property, the purchase of which was 100 percent financed by the Bank.

(c)     The credit memo showed that the borrower, who had liquid assets of $93,000 and gross personal income of $120,000, could not afford the debt.  In fact, the credit request's form for "repayment sources," with line items for detailed information on income, expense, debt, assets, liabilities and cash flow, was left blank.

(d)     Repayment of the loan depended on renovation and sale of the two units.  The request, however, made no reference to any construction plans, cost detail, or any other information about the contemplated "renovation." An appraisal on the two units, opining that the properties would have an "as completed" market

value of $460,000 each, stated that the "subject [property] is currently a shell.  This is proposed construction.   No detailed plans & specs were provided to the appraiser."

(e)    Repayment also depended on the completion of renovation of the entire building.  As the appraisal also stated:  "The [Drayton Towers] building is in the process of being renovated. The value stated in this analysis is also contingent upon the developer finishing the common areas and proposed exterior improvements in a workmanlike manner."

(f)    As lender to the Drayton Towers developer, Darby was well aware that the Towers project was over-budget, behind schedule, and plagued with delay. Over a year after **HR's** loan, a Darby loan officer reported, with respect to another Darby-financed ADC loan in the Towers:  "Drayton Towers is not much improved overall from where it was when the project began.  Staff and clients cannot enter the office space without need to climb over and around construction materials, the elevators don't work...."

158.   Darby incurred at least $231,198 in loss on the **HR** loan.   In a charge-off request in August 2009, the loan officer observed:   "The out-of-market borrower did initially help us by purchasing two units on the 7th floor, but her

build-out plan was flawed from the start and should have been altered prior to funding or not funded at all."

159. S. Coomer and Thompson were negligent, grossly negligent, and breached their fiduciary duties to Darby by making and approving the foregoing loan, causing the Bank damages.

**Loan No. 14: OSM Partners, LLC**

160. By credit memorandum dated October 17, 2007, a loan officer requested a loan of $276,250 to OSM Partners, LLC ("OSMP"). Terms were 12 months with monthly interest-only payments. Defendants Banks, Bedingfield, Bowden, Davis, R.A. Williams, C. Williams, and R.D. Williams voted in favor of making the loan.

161. The DLC approved the request, notwithstanding at least the following manifest violations of prudent lending principles and material requirements of the Bank's Loan Policy:

(a)     OSMP already owed Darby $1.8 million in outstanding loans. The credit request depicted the borrower as a small business in financial distress. The purpose of the loan was to pay "all accounts payable aged over 90 days." "In some cases," suppliers were refusing to grant credit and were demanding cash on delivery.

(b)     Darby had a security interest in the borrower's accounts receivable, inventory, furniture, fixtures, and equipment.   Darby's Loan Policy, however, required discounting the collateral, which the credit memo plainly failed to do. Properly discounted, the loan had a LTV ratio of 195.2 percent.   As a result, $1.029 million in total relationship debt was unsecured.

(c)     In violation of the Loan Policy, which generally required unlimited guarantees from all members of a limited liability company borrower, the two OSMP guarantors each guaranteed only $50,000.

(d)     The credit request itself stated that the proposed loan was "substandard" based on the borrower's historical and existing losses, the nature and shortfall of collateral, and the "very" limited personal guarantees.

162.   The loan was charged off on December 29, 2009, as a total loss.   The charge-off request noted:   "Problems with this relationship date back ten years. Loss potential may have been less had Darby Bank liquidated the assets of this business earlier rather than trying to lend the company out of trouble."

163.   Defendants Banks, Bedingfield, Bowden, Davis, R.A. Williams, C. Williams, and R.D. Williams acted negligently, grossly negligently, and in breach of their fiduciary duties to Darby in making and/or approving the foregoing loan, causing the Bank damages.

**Loan No. 15: RC**

164.   On November 13, 2007, Defendant Harp made a $10,000 unsecured LOC for an individual, "RC," the "market" president for a privately held bank in Lakeland, Georgia.   Harp was the borrower's brother in law.   The credit memorandum stated that the LOC would be used to provide for real estate maintenance and capital needs. On January 8, 2008, Defendant Harp made another $26,250 unsecured loan to RC for the stated purpose to pay for "investment property expenses."  The loans were due in full in 12 months, with interest-only monthly payments.

165.   Defendant Harp approved the loans, notwithstanding at least the following manifest violations of prudent lending principles and material requirements of the Bank's Loan Policy:

(a)      The loans' ostensible purpose was contradicted by the borrower's personal financial statements.   Other than his residence, the borrower did not report ownership of any real property.   The request contained no estimate of annual expenses, no explanation of the use of the loan proceeds, and no justification for the loan amount.

(b)      Darby's Loan Policy required that unsecured loans be granted only to businesses or individuals "whose financial strength unquestionably supports such

credit." The credit memos stated incorrectly that RC had $830,000 in liquid assets. The borrower's financial statements disclosed that he had only $5,000 in cash, $825,000 worth of illiquid stock in his employer bank, and options to purchase 4,000 more shares of such stock.   Under Darby's Loan Policy, closely held securities were deemed to have no collateral value.

(c)    The loans to RC also were structured in violation of the Loan Policy, which required an unsecured loan to have a definite repayment source and schedule and to be granted only for a short period of time.

(d)    The borrower's financial statement disclosed $373,000 in other outstanding bank debt and $100,000 in annual gross income.  The credit request, however, did not assess the borrower's ability to meet total fixed monthly obligations, which under the Loan Policy could not exceed 36% of gross monthly income.

166.   The borrower made only partial repayment over the succeeding years. In October 2010, the Bank charged-off $21,351.71.  The charge-off request noted: "Unsecured lending is very risky.  If/when made, unsecured debts should be structured on a timely payment schedule."

167.   Defendant Harp acted negligently, grossly negligently, and in breach of his fiduciary duties to Darby in making and/or approving the foregoing loan, causing the Bank damages.

**Loan Nos. 16, 17, and 18: "N Security LLC" (alias)**

168.   Based on a credit memo prepared by Defendant Harp and dated March 13, 2008, Defendant Banks approved a $402,020 loan for the purposes funding the borrower's commercial and home security business.  The loan was originally structured as a 12-month, interest-only line of credit ("LOC").  The borrower had outstanding real estate loans with Darby, resulting in a total debt relationship of $1.7 million.

169.   The Bank extended more funds to the borrower three times as follows: (1) additional $47,980, totaling $450,000, on September 3, 2008; (2) additional $356,250, totaling $806,250, on September 8, 2008; both increases were approved by Harp and, on information and belief, by Banks because the amounts were in excess of Harp's authority; and (3) additional $100,250, totaling $906,300, approved by Defendant DLC members Bedingfield, Davis, C. Williams, R.A. Williams and R.D. Williams on November 19, 2008.

170.   Defendants approved the foregoing loans, notwithstanding at least the following manifest violations of prudent lending principles and material requirements of the Bank's Loan Policy:

(a)   The LOC was structured poorly and in violation of the Loan Policy. It initially extended credit more than double the borrower's 2007 annual net income of $164,000.

(b)   The line was to be secured by the borrower's accounts receivables and "equipment." The initial request, however, included no balance sheet information (including equipment or accounts receivable).

(c)   Consistent with the description in the credit memos, the LOC allowed the borrower to draw on the line without limitations tied to the collateral value. This violated the Loan Policy's express collateral margin requirements, which stated that "[m]argins should be built between collateral value and loan amount to provide for loss of collateral value due to wear and tear, erosion by market forces, or loss of value due to sale under distress circumstances." The specific margin requirements included 70 percent for current accounts receivable and 75 percent of equipment purchase price.

(d)   As a result of this defect, by November 2008, the Bank had advanced $787,000 to the borrower backed by only $250,000 in accounts receivable. At

least $500,000 of the amount advanced was completely unsecured. The Loan Policy permitted unsecured loans only to businesses whose financial strength "unquestionably supports such credit," which did not describe **N Security**.

(e)     Despite notice of these facts, in November 2008, the DLC granted an increase to the line, to bring the total to $904,000. The November credit request also disclosed that for the nine months ended September 2008, the borrower had negative cash flow of $256,181, a negative debt service coverage ratio of 1.1, and only $5,000 in cash. The two guarantors had combined liquid assets of approximately $500,000.

171.     Darby lost at least $404,300.10 on its loan to **N Security**. In a request to place the debt on nonaccrual status in September 2009, the bank officer noted: "There was a lot of debt advanced on this relationship in a very short period of time. The largest loan is a line of credit for contracts and receivables which did not already exist. Although we have an assignment of the existing accounts, collection on these accounts will rely on the business being operable so that the contracts remain valid."

172.     A charge-off request dated December 29, 2009 stated: "Rapid growth funded by rapidly increasing working capital borrowings is dangerous. For

companies with a strategy of rapid growth, alternative sources of funding growth should be sought."

173.   Defendants Banks, Bedingfield, Davis, C. Williams, R.A. Williams and R.D. Williams acted negligently, grossly negligently, and in breach of their fiduciary duties to Darby in making and/or approving the foregoing loans, causing the Bank damages.

### Loan nos. 19 and 20:  SB Partners, LLC

174.   On March 19, 2008, the DLC approved two loans to SB Partners, LLC.   The first loan of $6,548,000 was to acquire 132 developed lots in a residential subdivision (the "lot loan").   According to the credit memo, the second loan ("second loan") for $1,019,727 was to cover debt service and pay a portion of a personal loan of the borrower's main guarantor and principal, "**CW**," a former Darby Board member.   The loans were repayable in 18 months, with monthly interest-only payments during the term.

175.   Defendants Banks, Bedingfield, Bowden, Davis, C. Williams, R.A. Williams and R.D. Williams voted for these loans, notwithstanding at least the following manifest violations of prudent lending principles and material requirements of the Bank's Loan Policy:

(a)     The borrower, a single-purpose entity formed for the purpose of acquiring the developed lots, put no equity into the land purchase.

(b)     **CW**, the primary guarantor, and his related companies owed over $4.6 million to Darby before these two loans were made.  The credit request showed that the related parties' checking accounts were collectively overdrawn by <$2,425>.

(c)     The collateral value for the lot loan was based on a stale appraisal dated October 7, 2005, two and one-half years old.  Even using that appraisal, the loan had an 87 percent LTV ratio, violating Darby's Loan Policy and exceeding the State and Federal guidelines of 75 percent for land development.  In addition, the credit request failed to document the exception, another violation of the Policy and federal regulation.  Instead, it listed, under loan "weaknesses," "weak collateral margins" and "residential real estate market."

(d)     The second loan was secured by an assignment of development rights in ten undeveloped boat slips out of territory in South Carolina.  The boat slips were last appraised on September 12, 2006 at a value of $1,500,000.  No new appraisals were obtained.

(e)     The credit memo informed the DLC that with the two new loans, the "Total Debt Relationship of [**CW**] Will Exceed Bank's Internal Lending Limit."

The facts disclosed in the request also show an LTV ratio for all relationship debt of 96 percent (even using outdated appraisals).   Nonetheless, the loan was given a "4" rating (Average) at origination.

(f)     The credit memorandum stated that "[r]epayment of this [lot] loan will be based on lot sales."   The request, however, projected that the lot sales would take four to five years in the current market, which would make it impossible to repay the 18-month loan at term.   The borrower had no purchase or refinance commitments or other identifiable means to pay off the loan through lot sales.

(g)     On April 15, 2009, the second loan was increased by $330,555, for a total of $1,350,282, and extended to April 14, 2010.  Again, the DLC received no updated appraisal information on the boat slips.

176.   In the two years following extension of the loans, the borrower sold only 13 residential lots.  The Bank suffered a loss of $1,216,314 on the first loan. The boat slips were never developed, and the Bank assigned no value to them when it fully charged off the second loan on December 29, 2009, suffering a loss of $1,217,448.87.   The charge off request stated:  "We should have required [a] new appraisal and equity when [the borrower] purchased this project . . . ."

177.  Defendants Banks, Bedingfield, Bowden, Davis, C. Williams, R.A. Williams and R.D. Williams acted negligently, grossly negligently, and in breach of their fiduciary duties to Darby in making and/or approving the foregoing loan, causing the Bank damages.

**Loan No. 21:  Company N, Inc. (alias)**

178.  By credit memorandum dated March 26, 2008, Defendant Harp proposed a 12-month, interest-only loan for $5,672,401 loan to **Company N** to develop 470 lots for residential construction in Valdosta in Lowndes County, secured by 101.9 acres.

179.  On April 23, 2008, Defendants Banks, Bedingfield, Davis, C. Williams and R.D. Williams voted in favor of funding this project, notwithstanding at least the following manifest violations of prudent lending principles and material requirements of the Bank's Loan Policy:

(a)  The Bank had no prior relationship with **Company N** or its principal and guarantor, "**LN.**"  The credit memorandum's section for credit analyst comments noted, as weaknesses, "cash flow of condo project if amortizing" and "issues in residential real estate market."

(b)  The borrower and guarantor lacked the capacity to repay.  Company N had negative $3.8 million in cash flows from operations in 2006 and negative

$707,000 in 2007, negative $569,000 in working capital, and only $501,178 in liquid assets.  The guarantor had $158,000 in liquid assets.  The credit request did not address the guarantor's contingent liabilities.

(c)     Repayment depended on the development and sale of at least 200 lots. The credit request identified no contingency plan.  According to the DLC meeting minutes, Defendant R.A. Williams asked: "If things don't work out where will his liquidity come from?"

(d)     The appraised "as is" value of $3,100,000 and "prospective" value of $8,590,000 as of December 14, 2007 were manifestly unreliable.  The appraisal had been prepared for and addressed to Atlantic Southern Bank, not Darby, in violation the Bank's Loan Policy and 12 C.F.R. Part 323.  The appraisal was also outdated on its face.

(e)     The credit memorandum "included an analysis prepared for Atlantic Southeastern [sic] Bank reviewing the housing market in the Valdosta area," based on data from the Spring of 2007, at least a year before the requested loan. According to the analysis given to the DLC, even as of the Spring of 2007:

> Almost all Federal Reserve districts have reported softening housing markets with high inventories and decreased residential building. The housing industry continues to work through an adjustment following a boom fueled by the lowest mortgage rates in four decades, and a speculative frenzy as investors rushed to cash in on soaring real estate

prices. Sales of new and existing homes still remain below year-ago levels although declines show signs of moderating…. Demand for housing can vary sharply from year to year and market to market. Overall, the market in Lowndes County is mixed…. When combined, all single-family residential lots mentioned in this report new or updated [as of Spring 2007] total 3,055 and are comprised of vacant lots, spec homes and pre-sales.

(f)      The appraisal projected an absorption period of 72 months—six years from the "as of" date. Thus, the only evidence available to the DLC refuted any possibility that the borrower could sell 200 lots and repay the loan in 12 months.

(g)      After approving and funding the loan, Darby discovered in early 2009 that **Company N** had defaulted on a $6.2 million loan from Atlantic Southern in December 2008. The Bank also learned that **LN** had personally guaranteed **Company N's** debt to Atlantic Southern. The Bank asserted that **Company N** and **LN** had never disclosed the guarantee to Atlantic when seeking the loan from Darby, a breach of and default under the loan agreements. In approving the loan, however, the DLC knew but ignored that Atlantic Southern had withdrawn from financing the project.

(h)      As of July 2010, the borrower had sold only 10 lots. Darby charged off $496,852.36. The charge-off request admitted, "We need to have a better judgment on the customers we decide to do business with in the future."

180. Defendants Banks, Bedingfield, Davis, Harp, C. Williams and R.D. Williams acted negligently, grossly negligently, and in breach of their fiduciary duties to Darby in making and/or approving the foregoing loan, causing the Bank damages.

**Loan No. 22: GS**

181. On July 16, 2008, the DLC approved a request for an individual, "GS," to "restructure" a construction loan of $677,400 into a "single-pay" loan payable in 12 months, with monthly interest-only payments during the term. According to the credit memo, **GS** had $2 million in total relationship debt with the Bank. He had run out of loan proceeds from an earlier Darby loan to construct a new office for his architectural business on one floor of Drayton Towers in Savannah. He needed additional time to sell other real estate properties, pledged for other Darby debt, to reduce his overall indebtedness to the Bank, including the construction loan.

182. Defendants Banks, Bedingfield, Bowden, Davis, C. Williams, R.A. Williams and R.D. Williams voted in favor of this loan, notwithstanding at least the following manifest violations of prudent lending principles and material requirements of the Bank's Loan Policy:

(a)     The borrower and guarantor, **GS**'s architectural firm, could not repay the loan.  The borrower's cash liquidity was just $59,774, with gross income of $210,000.  The memorandum did not include any current financial information on the guarantor firm.  As of year-end 2006, however, the firm had $1,000 in total equity (which included a $25,000 loan receivable from **GS**) and $58,000 in liquid assets.

(b)     The credit memo disclosed three Loan Policy exceptions, including LTV ratios over Policy limits on the proposed loan and other secured loans and missing current personal and business tax returns.  It also identified three weaknesses, including the borrower's "limited liquidity" and the business and real estate market slowdown.

(c)     The loan's collateral was the Drayton Towers office unit and another commercial property on East Liberty Street in Savannah, cross-pledged to secure a $223,000 Darby loan to **GS**'s firm.  The credit request described the Drayton Towers construction "as not much improved overall from where it was when the project began" in early 2007.  "The build-out went over budget and exceeded the amount of time expected to complete."

(d)     The credit memo based collateral values on patently outdated appraisals at least two years old.  Even using those values, the credit memo noted a

90 percent LTV ratio for the proposed "restructured" loan, which exceeded permissible limits.  An updated appraisal as of October 15, 2008 showed a 98.7 percent LTV ratio.

183.  Darby ultimately foreclosed and charged-off $296,412 on the restructured construction loan.  In a charge-off memo on September 23, 2009, the loan officer stated that she had "discouraged the purchase and renovation of the Drayton Tower office space and should have refused to proceed with the project.... The plan to sell [real estate collateral for other loans] would have worked, but success was dependent on sale—second mistake.  There was not a contingency beyond selling something."  In a charge-off request related to a separate loan to **GS** and two partners that same month, the loan officer observed that the borrowers "did not have enough liquidity or capacity and had too much debt.  They were too reliant upon speculative real estate projects for income."

184.  Defendants Banks, Bedingfield, Bowden, Davis, C. Williams, R.A. Williams and R.D. Williams acted negligently, grossly negligently, and in breach of their fiduciary duties to Darby in making and/or approving the foregoing loan, causing the Bank damages.

C.    **Loss Transactions Subsequent to July 17, 2008.**

185.    As stated in paragraphs 41 through 95 above, the Bank's regulators repeatedly advised the Bank's senior management, including Bowden and Banks, and the Directors of serious deficiencies in the Bank's lending function, including its underwriting, documentation, and credit administration.

186.    On July 17, 2008, the Board and senior management, including Defendants Bowden, Banks, C. Williams, R.D. Williams, and D. Coomer, met with regulatory representatives to discuss their findings from the recently concluded examination, including deficiencies with respect to the Bank's capital levels and loan underwriting and credit administration policies, and its escalating volume of adversely classified assets.  At that time, the examiners downgraded the Bank's Composite CAMELS rating from 2 to 3, placing the Board on notice that the deficiencies must be corrected promptly or the Bank's future could be jeopardized.  As alleged in paragraph 69, above, Defendant Bowden advised the full Board of the regulators' comments in a memorandum dated July 17, 2008.

187.    Among other things, the examiners' subsequent written report stated, bluntly:    "[T]he number of adversely classified borrowers indicates poor underwriting policies and procedures."

188.   Although Bowden and the Director Defendants (other than Tyson and Estroff, who had resigned from the Board by that time) promised to correct the Bank's underwriting deficiencies and address CRE overconcentration, they did not adequately direct, supervise, monitor, or control the activities of Defendants Harp and S. Coomer, as described below, and other loan officers who continued to engage in deficient lending practices with the Board's knowledge and acceptance.

189.   After July 17, 2008, Darby loan officers made 11 of the loans listed in the table at Exhibit A (numbers 23 to 33).  Those loans would not have been made, and the Bank would not have suffered the losses associated with the loans, if Bowden and the Director Defendants remaining on the Board had supervised the operation of the Bank as they should have done.

**Loan Nos. 23-29, 31-32:  Scott H Loans**

190.   In September, November, and December 2008 and January 2009, Defendant Harp made nine loans to related borrowers who were relatives or business associates of developer **"Scott H,"** an individual and a major borrower of the Bank.

191.   Harp caused the Bank to make the loans, notwithstanding at least the following manifest violations of prudent lending principles and material requirements of the Bank's Loan Policy:

(a)    The loans should have been aggregated and presented to the DLC for approval as one transaction.  Harp divided them into nine separate loans that were each within his $500,000 lending authority so that he alone approved each loan.

(b)    These loans, to borrowers **CR, DH, SH,** and Gateway Properties USA, LLC, were for the acquisition, development, and construction of single family homes.  The loan terms ranged from one year to 35 months.

(c)    The primary repayment source for each loan was to be from rental income, and the secondary repayment source would be from the liquidation of the collateral.  However, there was no evidence of any of the properties being rented, and therefore no basis to warrant reliance on this source of repayment.

(d)    In addition, the homes on the properties were not built at all or only partially built, and the appraised values were "subject to completion per plans." Although the stated appraised values were between 70 and 85 percent LTV, the uncompleted construction meant that the actual LTV ratio was 100 percent.

(e)    The borrowers had no equity in the projects at issue, and the borrowers' financial statements were not analyzed or verified.  In some instances, the financial statements were not even signed.  The financial condition of the borrowers was inadequate to support the loans.

(f)     All of the loan funds were disbursed, although the construction was no more than 40 percent to 60 percent completed, and in at least one instance, never started.  No draw requests, independent construction inspections, plans, permits, environmental reports, or schedules of estimated advances were in any of the files. The loan activity was completely unmonitored.

192.   Harp caused Darby to lend a total of $1,466,000 on these nine related loans.  All but one of the loans was a total loss, and Darby incurred losses of $1,424,000 on the nine loans.

193.   Defendant Harp was negligent, grossly negligent, and breached his fiduciary duties to Darby by making the foregoing loans in violation of safe and sound banking principles and in direct violation of the directives of the bank regulators.

194.   Bowden, Banks and Director Defendants (other than Tyson and Estroff) were negligent and grossly negligent and breached their fiduciary duties in failing to supervise Harp and Darby's other management following the receipt of regulatory criticisms and directive arising from the May 2008 examination.

**Loan No. 30: SM**

195.   On March 1, 2007, Defendant S. Coomer approved a $50,000 unsecured, six-month LOC to the borrower, "SM," an individual, for working

capital for a new venture—a residential mortgage lending business in Savannah. In late August 2007, S. Coomer approved a renewal and extension of the line for 12 months. On September 2, 2008, S. Coomer approved a $247,635 loan to pay off a $185,000 second mortgage on the borrower's residence, roll in and extend the $50,000 loan for another twelve months, and cover closing charges. The new advance and renewed loan would be secured by a second mortgage on the residence, behind a $461,000 mortgage held by another lender.

196.   Defendant S. Coomer approved the loan, notwithstanding at least the following manifest violations of prudent lending principles and material requirements of the Bank's Loan Policy:

(a)   The 2007 unsecured loan and its initial extension for 12 months in August 2007 violated the Loan Policy's strict conditions for unsecured loans. Repayment would "stem from" the future sale of her residence, an unscheduled contingency. Although the house was "under contract" at the time of the initial loan, no sale took place. In the request for renewal in August 2007, the loan officer acknowledged that the mortgage industry "was dealing with various problems," and now proposed that SM would repay from "her personal income." The request did not explain how the borrower, who earned $127,000 in gross income in 2006 and

whose future income depended on a faltering mortgage industry, would repay a $50,000 debt in 12 months from personal income.

(b)     The 2007 unsecured credit was not supported by any cash flow or other financial analysis to determine if the borrower could meet interest payments or repay principal when due, notwithstanding existing mortgage loans of at least $646,000 on her residence, which she had been unable to sell, and total overall liabilities of $1.158 million

(c)     In connection with the loan's September 2008 increase to $247,635, secured by the second mortgage, and additional 12-month extension, the credit request showed that the borrower did not have the capacity to make interest payments or repay the loan principal when due.  She was now unemployed, had earned only $22,000 in 2007, and reported $6,600 in liquid assets.

(d)     Under the September 2008 proposal, the loan would only be repaid through sale of the residence at a sufficient price.  S. Coomer approved the loan without requiring an appraisal, notwithstanding that the Loan Policy required appraisals for all second mortgage loans and federal regulations required appraisals for secured real estate loans of $250,000 or greater.   Instead, the credit memorandum improperly relied on a 2008 tax assessed value of $876,250.

197. The borrower eventually sold the residence in early 2010. After satisfaction of the first mortgage (approximately $461,000), Darby received just $41,328.72, less than the original unsecured amount, and charged off the remainder. Darby lost $206,291.63. According to the minutes, at the DLC meeting approving the charge-off, S. Coomer stated that "[t]aking second[] [mortgages] behind large first [mortgages] is something we should not have done."

198. Defendant S. Coomer acted negligently, grossly negligently, and in breach of his fiduciary duties to Darby in making and/or approving the foregoing loan, causing the Bank damages.

199. Bowden and the Director Defendants (other than Tyson and Estroff) were negligent and grossly negligent and breached their fiduciary duties in failing to supervise S. Coomer and Darby's other management following the receipt of regulatory criticisms and directive arising from the May 2008 examination.

200. Bowden and the Director Defendants other than Tyson and Estroff are likewise liable for losses that Darby incurred on other CRE and ADC lending after July 17, 2008. Their failure to curtail severely or cease such loans after Darby's composite downgrade was negligent, grossly negligent, and in breach of their fiduciary duties.

**Loan No. 33: WDC**

201.   In 2007, Defendant Harp made two unsecured loans totaling $33,000 to an individual borrower, **WDC**, a loan officer at another bank in Valdosta, Georgia, "**G Bank.**" Both loans were due in 12 months. No interest payments were required until the end of the terms. When **WDC** did not pay, Harp caused the loans to be "renewed" in 2008. The unrepaid loans were consolidated and "renewed" again on October 26, 2009.

202.   In connection with the **WDC** loans, Defendant Harp committed the following manifest violations of prudent lending principles and material requirements of the Bank's Loan Policy:

(a)   In 2007, Harp submitted a personal financial statement to the Bank reflecting, among other things, a $35,150 note payable to **G Bank**. In connection with his petition for bankruptcy on January 27, 2010, Harp's schedule listed **G Bank** as an unsecured creditor on a personal loan in the amount of $39,253.

(b)   On information and belief, in 2010, Darby learned that **G Bank** had fired **WDC** because he had extended an unsecured loan by **G Bank** to Harp in exchange for Harp's extension of an unsecured loan by Darby in a comparable amount. **WDC** petitioned for bankruptcy on or about March 26, 2010.

(c)     On information and belief, Harp authorized the unsecured loan to **WDC** as a *quid pro quo* for obtaining an unsecured personal loan from **G Bank**, and thereby misused Darby's assets for personal purposes.

(d)     The unsecured loans to **WDC** also violated the strict limits on such lending under Darby's Loan Policy, including the lack of a specific, short schedule for repayment and extension of the loan to an unqualified borrower.

(e)     Harp also violated the Loan Policy by renewing the loans to conceal problems with credit quality.

203.   On March 24, 2010, the Bank recorded a loss of $33,000, the full amount of the **WDC** loans.

204.   Defendant Harp was negligent, grossly negligent, and breached his fiduciary duties to Darby by making the foregoing loans, causing the Bank damages.

205.   Bowden and the Director Defendants (other than Tyson and Estroff) were negligent and grossly negligent and breached their fiduciary duties in failing to supervise Harp's and Darby's other management following the receipt of regulatory criticisms and directive arising from the May 2008 examination.

### Prejudgment Interest

206.   Under section 11(1) of the FDI Act, 12 U.S.C. § 1821(1), the FDIC as Receiver may recover prejudgment interest.   Under O.C.G.A. § 51-12-14,

prejudgment interest accrues 30 days after the receipt of a demand letter that complies with the statutory requirements until the date of judgment, if the judgment amount equals or exceeds the demand.  Counsel for FDIC sent demand letters to the Defendants other than Thompson and Smith on September 26, 2012.

207.  FDIC is entitled to prejudgment interest at the Georgia statutory rate of prime plus 3 percent from September 26, 2012 through the date of judgment.

208.  The losses outlined above are based on information currently available to FDIC-R, and the amounts are subject to change as additional information is discovered.

## V.

## CAUSES OF ACTION

### COUNT 1

#### Negligence (Against All Defendants)

209.  FDIC incorporates by reference each of the allegations set forth in paragraphs 1 - 208 above, as if fully set forth herein.

210.  In accordance with the common law, O.C.G.A. §§ 7-1-490, 51-1-2, and other laws and regulations, each of the Defendants, as officers and/or directors of Darby, owed the Bank the obligation to exercise the degree of diligence, care, and skill that ordinarily prudent persons in like positions would exercise under

similar circumstances in the management, supervision, and conduct of the Bank's business and financial affairs, including its lending practices.

211.  Each Defendant agreed and was obligated by statute, contract, and/or common law to diligently and honestly administer the affairs of the Bank, and was under a duty to ensure that the Bank operated in compliance with all laws, rules, and regulations, as well as all applicable policies, rules, and regulations of the Bank. The Defendants, collectively and individually, owed to the Bank the highest duty of due care and diligence in the management and administration of the affairs of the Bank, in the use and preservation of its assets and property, and in the adoption and carrying out of banking practices that were safe, sound, and prudent.

212.  By their actions and inactions, as alleged herein, each of the Defendants failed and neglected to perform his or her respective duties as Officers and/or Directors of the Bank, constituting breaches of his or her statutory and common law duties of care owed to the Bank.

213.  Defendants are not entitled to the application of the business judgment rule because none of the Defendants' actions or inactions that are the basis of this claim were taken in good faith, nor were the Defendants reasonably well-informed in taking such actions or inactions because each of the Defendants ignored regulators' warnings regarding loan underwriting and risk management

deficiencies and repeatedly approved loans in violation of the Loan Policy and the FDIC's Rules and Regulations.

214. As detailed in this Complaint, Defendants failed to discharge their obligations to the Bank as described herein, breaching the statutory and common law duties that they owed to the Bank, and thus were negligent by, among other things:

a. Failing to analyze and assess the Loss Transactions in good faith and in an informed and deliberate manner;

b. Failing to follow reasonable and prudent procedures for underwriting and monitoring Darby's CRE and ADC loans;

c. Causing and/or allowing Darby to approve and fund loans in violation of the Loan Policy and applicable regulations;

d. Causing and/or allowing Darby to approve and fund loans without adequate plans for repayment and/or adequate and reliable sources of repayment;

e. Causing and/or allowing Darby to approve and fund loans notwithstanding the prospective borrower's demonstrable lack of capacity to repay the loan in accordance with its terms,

and/or the lack of information necessary to make a reasonable judgment regarding the capacity to repay;

f. Causing and/or allowing Darby to approve and fund loans the repayment of which depended on speculation on the borrower's future sale or other monetization of the collateral;

g. Causing and/or allowing Darby to approve and fund loans based on inadequate or wrongly valued collateral securing the loans;

h. Causing and/or allowing Darby to approve and fund loans without adequately analyzing borrower ability to perform on the loan and without adequately analyzing the ability of the secured property to support the loan;

i. Failing to exercise independent judgment in connection with the review and approval of the Loss Transactions;

j. Failing to heed warnings of federal and state regulators;

k. Failing to heed warnings from other third parties, including external loan reviewers and auditors;

l. Ignoring warnings of Darby's own internal audit staff; and

m. Failing to properly manage, direct, and conduct the business and affairs of Darby to ensure compliance with all applicable laws and regulations and safe, sound, and prudent principles of banking.

215. In connection with their actions and inactions described in this complaint, Defendants failed to make decisions on the basis of a rational process; failed to avail themselves of all material and reasonably available information; abdicated their functions and, without making a conscious decision to abstain from action, failed to act; and disregarded repeated warnings from regulators and third parties.

216. Defendants also knew, or in the exercise of reasonable diligence should have known, that their practices and the practices of other Bank officers and employees over whom they exercised supervisory control were improper, imprudent, and harmful to the Bank.

217. With respect to the Loss Transactions that they approved, each of the Defendants owed to the Bank duties that included, but were not limited to, informing himself or herself about the proposed loans and the risks the loans posed

to the Bank before voting on the loan; approving loans that conformed with Bank Loan Policy; ensuring that any loans he or she approved were underwritten in a safe and sound manner; ensuring that any loans approved were secured by sufficiently valuable collateral to prevent or minimize the risk of loss to the Bank; and ensuring that any loans approved did not violate applicable banking regulations and/or create unsafe and unsound concentrations of credit.

218.   With respect to the Loss Transactions that each approved, Defendants were in breach of their duties in that, among other things, they failed to adhere to lending policies, applicable requirements, and sound lending practices, and were aware, or in the exercise of reasonable diligence should have been aware, of the deficiencies in underwriting and loan support exhibited by the Loss Transactions identified above, yet Defendants (as identified in Exhibit A and the above Loss Transaction allegations) approved the subject loans anyway.

219.   Defendants' breaches of duty were committed also with respect to Loss Transactions that each voted to renew and/or extend, or that constituted renewals or extensions, in whole or in part, rendering Defendants liable for all losses incurred by the Bank on such loans.

220.  As a direct and proximate result of the negligent acts and omissions of the Defendants, the Bank suffered damage and sustained losses in such amount as will be proved at trial.

221.  With respect to their actions and inactions in managing the affairs of the Bank, Defendants pursued a common plan or design and, therefore, each Defendant is jointly and severally liable for all losses.  The Defendants are liable to FDIC-R, jointly and severally, in such amount as will be proved at trial.

222.  At a minimum, each Defendant who approved a Loss Transaction, as shown in Exhibit A and the above Loss Transaction allegations, is liable in the amount of the loss associated with that Transaction.

223.  In addition, Defendants Bowden, Bedingfield, Davis, C. Williams, R.D. Williams, R.A. Williams, D. Coomer, Hartley, Smith, and Zoller are liable jointly and severally for losses suffered on the Loss Transactions approved on or after July 17, 2008, based on their failure to act, upon receipt of the results of the most recent regulatory exam, to mitigate and/or prevent future losses in accordance with their duty to oversee and supervise the Bank's CRE and ADC lending practices, and they are also liable for losses incurred on other CRE and ADC loans made after July 17, 2008.

224. Defendant Harp is also liable for approving loans he was not authorized to approve and which he knew or reasonably should have known did not meet minimal standards of acceptable credit quality.

## COUNT 2

### Gross Negligence (Against All Defendants)

225. FDIC incorporates by reference paragraphs 1 through 208 and 211 through 219 set forth above.

226. Section 1821(k) of the Financial Institutions Reform, Recovery and Enforcement Act, 12 U.S.C. § 1821(k), provides that directors and officers of failed financial institutions may be held liable to FDIC receiverships for loss or damage caused by their "gross negligence," as defined by applicable state law. Georgia law defines "gross negligence" as the absence of that degree of care which every man of common sense, however inattentive he may be, exercises under the same or similar circumstances.

227. As officers and/or directors of the Bank, at all times, the Defendants owed to Darby a duty to use care, skill, and diligence in the performance of their duties as officers and/or directors of Darby.

228.   The Defendants' actions and inactions as described herein exhibit such a degree of carelessness and/or inattention as to constitute gross negligence under Georgia law.   The Defendants knew or were careless and reckless in not knowing the facts outlined in paragraphs 211 through 219 above.

229.   With respect to their grossly negligent actions and inactions, the Defendants pursued a common plan or design, or otherwise acted in a common or concerted manner, and therefore, each Defendant is jointly and severally liable for all damages.

230.   As a direct and proximate result of these Defendants' gross negligence, the FDIC-R suffered damages in an amount to be proved at trial.

231.   At a minimum, each Defendant who approved a Loss Transaction, as shown in Exhibit A and the above Loss Transaction allegations, is liable in the amount of the loss associated with that Transaction.

232.   In addition, Defendants Bowden, Bedingfield, Davis, C. Williams, R.D. Williams, R.A. Williams, D. Coomer, Hartley, Smith, and Zoller are liable jointly and severally for losses suffered on the Loss Transactions approved on or after July 17, 2008, based on their failure to act, upon receipt of the results of the most recent regulatory exam, to mitigate and/or prevent future losses in accordance with their duty to oversee and supervise the Bank's CRE and ADC lending

practices, and they are also liable for losses incurred on other CRE and ADC loans made after July 17, 2008.

233.  Defendant Harp is also liable for approving loans he was not authorized to approve and which he knew or was reckless in not knowing did not meet minimal standards of acceptable credit quality.

## COUNT 3

### Breach of Fiduciary Duty (Against All Defendants)

234.  FDIC incorporates by reference paragraphs 1 through 208 and 211 through 219 above.

235.  As directors and officers of the Bank, Defendants owed fiduciary duties of care and loyalty to the Bank to act with the utmost care and in the best interests of the Bank, which included implementing and operating the Bank's lending policies to protect Darby against excessive risk and to comply with safe and sound lending practices.

236.  By committing the negligent and grossly negligent acts detailed herein, Defendants breached their fiduciary duties to the Bank.  Defendants pursued a common plan or design, or otherwise acted in a common or concerted

manner, and therefore, each Defendant is jointly and severally liable for all damages.

237.   As a direct and proximate result of Defendants' breach of fiduciary duties, the FDIC-R suffered damages in an amount to be proved at trial.

238.   At a minimum, each Defendant who approved a subject loan, as shown in Exhibit A and the above Loss Transaction allegations, is liable in the amount of the loss associated with that lending decision.

239.   In addition, Defendants Bowden, Bedingfield, Davis, C. Williams, R.D. Williams, R.A. Williams, D. Coomer, Hartley, Smith, and Zoller are liable jointly and severally for losses suffered on the Loss Transactions approved on or after July 17, 2008, based on their failure to act, upon receipt of the results of the most recent regulatory exam, to mitigate and/or prevent future losses in accordance with their duty to oversee and supervise the Bank's CRE and ADC lending practices, and they are also liable for losses incurred on other CRE and ADC loans made after July 17, 2008.

240.   Defendant Harp is also liable for approving loans he was not authorized to approve and which he knew or was reckless in not knowing did not meet minimal standards of acceptable credit quality.

## VI. RELIEF REQUESTED

241.   Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the FDIC-R demands a trial by jury on all claims.

242.   The FDIC-R prays for a money judgment against all Defendants, jointly and severally, in sums to be proved at trial, together with appropriate interest pursuant to 12 U.S.C. § 1821(l), the costs of this action, and such other and further relief as the Court deems just and proper.[3]

/s/ Sean R. Smith, Esq.
William G. Leonard (S.D. Ga. Bar admission pending)
Georgia Bar No. 446912
Sean R. Smith
Georgia Bar No. 663368
Tobi T. Wiseman (Pro Hac Vice admission pending)
Georgia Bar No. 084354

TAYLOR ENGLISH DUMA LLP
1600 Parkwood Circle
Suite 400
Atlanta, GA  30339
770.434.6868
bleonard@taylorenglish.com
ssmith@taylorenglish.com
twiseman@taylorenglish.com
Attorneys for the Federal Deposit Insurance Corporation, as Receiver for Darby Bank & Trust Co.

---

[3]     As stated in paragraph 24, the FDIC-R seeks a judgment against Defendant Harp only to the extent of coverage under Darby's director and officer liability policy and does not seek any additional recovery from the personal assets of Defendant Harp.

# EXHIBIT A

| Loan | Date Approved | Loan Amount ($millions) | Loss ($millions) | Approval Votes | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Banks | Bedingfield | Bowden | S. Coomer | Davis | Estroff | Harp | Thompson | Tyson | R.A. Williams | C. Williams | R.D. Williams |
| 1.  RG | Nov. 17, 2006 | 1.890 | 1.095 | x | | x | | x | x | | | x | x | | x |
| 2.  134 Whitaker | Nov. 16, 2007 | 0.582 | 0.192 | x | | x | | x | x | | | x | x | x | x |
| 3.  Flint River | Jan. 10, 2007 | 1.873 | 0.265 | x | | | | x | | | | x | x | x | x |
| 4.  Castle Home | Mar. 21, 2007 | 3.500 | 1.743 | x | x | x | | x | | | | | x | x | x |
| 5.  V&W Props. | Feb. 7, 2007 | 0.941 | 0.473 | x | | x | | x | x | | | x | x | x | x |
| 6.  34 E. Broad | Mar. 7, 2007 | 1.417 | 0.890 | x | | | x | | | | x | | | | |
| 7.  Cumberland | May 25, 2007 | 5.500 | 2.495 | x | | x | | x | | | | | x | x | x |
| 8.  Henderson P. | June 12, 2007 | 0.500 | 0.500 | x | | x | | x | | | | | x | x | x |
| 9.  Henderson P. | Nov. 20, 2007 | 0.500 | 0.500 | x | | x | x | x | | | | | x | x | x |
| 10. RS | May 22, 2007 | 0.720 | 0.528 | x | | | x | | | | x | | | | |
| 11. NGL Inv. | June 18, 2007 | 0.726 | 0.319 | x | | | | | | | | | | | |
| 12. Lake Bowden | July 11, 2007 | 1.000 | 0.719 | x | | | | | | x | | | | | |
| 13. H. Reed | July 10, 2007 | 0.692 | 0.231 | | | | x | | | | x | | | | |
| 14. OSM Partners | Oct. 17, 2007 | 0.276 | 0.276 | x | x | x | | x | | | | | x | x | x |
| 15. R. Chauncey | Jan. 8, 2008 | 0.027 | 0.038 | | | | | | | x | | | | | |
| 16. N Security | Mar. 13, 2008 | 0.400 | | x | | | | | | x | | | | | |
| 17. N Security | Sept. 8, 2008 | 0.356 | 0.404 | | | | | | | x | | | | | |
| 18. Nichols Sec. | Nov. 19, 2008 | 0.100 | | | x | | | x | | | | | x | x | x |
| 19. SB Partners | Apr. 17, 2008 | 1.020 | 1.217 | x | x | x | | x | | | | | x | x | x |
| 20. SB Partners | Apr. 17, 2008 | 6.548 | 1.216 | x | x | x | | x | | | | | x | x | x |
| 21. Company N | Apr. 23, 2008 | 5.700 | 0.497 | x | | | | x | | | | | x | x | x |
| 22. GS | July 16, 2008 | 0.677 | 0.293 | x | x | x | | x | | | | | x | x | x |
| 23. CR (30) | Sept. 8, 2008 | 0.132 | 0.132 | | | | | | | x | | | | | |
| 24. CR (90) | Sept. 8, 2008 | 0.117 | 0.117 | | | | | | | x | | | | | |
| 25. CR (00) | Sept. 8, 2008 | 0.115 | 0.115 | | | | | | | x | | | | | |
| 26. CR (20) | Sept. 8, 2008 | 0.134 | 0.134 | | | | | | | x | | | | | |
| 27. SH (90) | Sept. 8, 2008 | 0.117 | 0.117 | | | | | | | x | | | | | |
| 28. SH (50) | Sept. 8, 2008 | 0.117 | 0.117 | | | | | | | x | | | | | |
| 29. SH (00) | Nov. 13, 2008 | 0.187 | 0.187 | | | | | | | x | | | | | |
| 30. SM | Sept. 2, 2008 | 0.248 | 0.206 | | | | x | | | | | | | | |
| 31. Gateway | Dec. 16, 2008 | 0.050 | 0.050 | | | | | | | x | | | | | |
| 32. DH | Jan. 21, 2009 | 0.249 | 0.249 | | | | | | | x | | | | | |
| 33. WDC | Oct. 26, 2009 | 0.033 | 0.033 | | | | | | | x | | | | | |
| **Total** | | **$36.601** | **$15.148** | | | | | | | | | | | | |