# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF GEORGIA

# SAVANNAH DIVISION

FEDERAL DEPOSIT INSURANCE ... )
CORPORATION as Receiver for Darby )
Bank & Trust, Co., ... )
... )
    Plaintiff, ... )
... )
v. ... )     Case No.    CV413-245
... )
WALTER B. BOWDEN, *et al.*, ... )
... )
    Defendants. ... )

# ORDER

When FDIC-insured banks fail the FDIC takes them over. It did that when Darby Bank & Trust Co. failed in November 2010. The FDIC then formed a separate legal entity, the FDIC-R, to act as Darby's receiver. The FDIC-R, in turn, brought this bank mismanagement case against sixteen of Darby's former directors and officers.[1] Doc.1. Pursuant to their Fed. R. Civ. P. 26 and L.R. 26.1(a) initial and ongoing discovery obligations, the parties endeavored yet failed to agree on a Joint Protocol

---

[1] Invoking 12 U.S.C. § 1821, it "seeks to recover losses of at least $15.1 million that the Bank suffered on commercial real estate loans and other business and residential loans . . . approved or permitted by Defendants between November 17, 2007 and October 26, 2009. . . ." Doc. 1 at 2; doc. 67 at 5.

for Electronically Stored Information (ESI), which is a method for sharing digitized documents. Doc. 54; doc. 67-1 at 2 ¶ 4; doc. 67-2 at 6; doc. 57-7 at 2-9 (duty-to-confer emails); doc. 69-2; doc. 69-6. Having already spent $614,000 to digitally scan about "2.01 terabytes of data or 153.6 million pages" of Darby records, doc. 69 at 2, 9, the FDIC-R obviously faces a substantial document management burden in fulfilling its discovery obligations to the defendants. It says that, "[e]ven though the Bank's documents were created under Defendants' custody and control, Defendants [via their proposed ESI Protocol, doc. 67] are now insisting that the FDIC-R shoulder the burden and expense of reviewing the documents and determining their responsiveness [to its claims and defendants' discovery]." Doc. 69 at 3.

So, the FDIC-R moves to implement its own ESI protocol[2] that it

---

[2] As the FDIC-R explains, Phase I of its protocol would place the burden upon the

FDIC-R to locate and produce substantially all ESI documents relevant to the FDIC-R's claims in this lawsuit. Subsequent to this "Phase I" production, the parties would then agree to a set of search terms to apply to the Bank's database maintained by the FDIC-R. After the search terms are applied to the database, the FDIC-R would then export any responsive documents into a review tool known as "Relativity," to which Defendants would have unlimited access. From there, Defendants would be afforded the opportunity to review the documents identified through searches and select for production only the documents Defendants desire. Not only is this [Phase II] approach efficient, it provides

says "balances the burden and expense of discovery among the parties and allows the [d]efendants essentially unfettered access to the Bank's documents." *Id.* It so moves because in their ESI Protocol, the FDIC-R argues, the defendants demand that it bear an undue discovery burden, requiring that it *repeatedly* search, review, and re-review myriad "second-run" (Phase II) documents, then turn over to them the documents relevant to both claims and defenses that arise in this litigation. Doc. 67-2 at 4-5 ¶ 8 (defendants' Protocol directing the FDIC-R to "specifically include any document specifically identified in the Complaint."); *id.* at 11 ¶ 10 (requiring the FDIC-R to "produce any and all non-privileged ESI in intends to rely upon in support of any claim *or*

---

Defendants with exactly the same level of search, review, and notation capabilities as enjoyed by the FDIC-R.

Doc. 69 at 3-4 (emphasis omitted); *see also* doc. 69-2 at 4-5 (FDIC-R's ESI Protocol). The FDIC-R emphasizes that it

has already produced to Defendants[,] at FDIC-R's sole cost and expense[,] the most relevant ESI identified by the FDIC-R in its Initial Disclosures, including nearly all of the relevant loan files, Reports of Examination, minutes and packets from the Board of Directors relevant committee meetings, and many other "core" materials bearing directly upon the transactions at issue, the tortious conduct of the Defendants, and the losses sustained as a result of Defendants' underwriting failures, loan policy violations, and disregard of credit and loan administration standards and safe and sound banking practices.

*Id.* at 5-6.

*defense* during the course of the litigation.") (emphasis added).

The FDIC-R assures the Court that it will "locate and produce" in full "categories of documents most likely to contain relevant information," thus the "vast majority of documents relevant to the defenses and claims of the parties in professional liability cases [like this]." Doc. 73 at 2-3. But the defendants, it complains, want the FDIC-R to search "*the rest* of the millions of pages of records" they created while running the bank, *id.* at 3 (emphasis in original), then have the FDIC-R "run [what are properly the defendants'] searches and have the *FDIC-R* review the results, cull out nonresponsive, irrelevant material, and hand over the responsive documents," *id.* at 4).[3] The FDIC-R insists that's not its burden. Citing its protocol's adoption by other courts, along with its proposed shared database access, enhanced security, and demonstrable cost-savings, the FDIC-R thus moves the Court to implement its ESI

---

[3]   The defendants are noticeably vague here, in that they insist that computer searching will not suffice, in which case endless searching, if not astronomically expensive *human*, manual review must be deployed. The defendants don't explicitly demand human review, doc. 67 at 6 (urging "traditional discovery methods where search terms cannot address the parties' discovery needs"; *id.* at 8 complaining that the FDIC-R's Protocol will "force Defendants to rely exclusively on search terms as a means of identifying documents for production"); *id.* at 8 n. 2, but that is the logical import flowing from their rejection of the FDIC-R's standing offer to assist them with search-term formulation for computerized document searches of Phase II document turnovers. Doc. 73 at 4; doc. 78 at 2-3.

Protocol, which it says will implement the correct allocation of discovery burdens between the parties. Doc. 69.

Opposing primarily on the ground that Fed. R. Civ. P. 34 requires the FDIC-R to search and turn over documents in the way they specify, the defendants insist their ESI Protocol "is in keeping with the intent of the Federal Rules of Civil Procedure. The FDIC[-R]'s ESI Protocol is not." Doc. 67 at 6; *see also* doc. 75. Citing examples where the FDIC-R's "Phase I" production failed to include documents referenced in the FDIC-R's complaint, doc. 75 at 3, they reject the FDIC-R's ESI Protocol because it

> calls for document discovery to be conducted without regard to a requesting party's right to obtain documents to defend himself, and without regard to a producing party's obligation to bear the burden and costs associated with identifying, reviewing, and producing relevant documents as they were kept in the usual course of business. The unilateral approach in the FDIC's ESI Protocol would: (a) force Defendants to rely exclusively on search terms as a means of identifying documents for production; and (b) shift to Defendants the FDIC's burden and expense of reviewing, identifying, and producing relevant documents. Neither the Federal Rules of Civil Procedure nor recent case law supports such a proposal.

Doc. 67 at 8 (footnote omitted). The FDIC-R's effort, defendants conclude, is simply an attempt "to carve out for itself an unknown exemption from the Federal Rules of Civil Procedure with the imposition

of an ESI protocol that drastically alters the procedures outlined in [Fed. R. Civ. P.] 34." Doc. 75 at 2.

In advancing their own ESI Protocol, the defendants propose that the parties "work together to cull the documents via agreed-upon search terms." Doc. 67 at 8 n. 2. They remind that the availability of "search terms" does not absolve the FDIC-R of its Rule 34 burden to locate and produce responsive documents, especially since search terms alone won't suffice. *Id.* at 9.; doc. 75 at 7-9. Emphasizing that often the FDIC will not maintain a failed bank's records in the same way that the bank did prior to its failure, and that this is what happened here,[4] the defendants contend that Rule 34 *requires* the FDIC-R to conduct a "responsiveness review" of the mass of seized documents in its possession. Doc. 68 at 10-11; doc. 75 at 8-9. And the FDIC-R's ESI Protocol, which invites a "Quick Peek" by the defendants, simply fails to uphold that obligation. Doc. 69 at 11-12.

The defendants raise other complaints about the FDIC-R's ESI

---

[4] As will be shown below, those responding to a Fed. R. Civ. P. 34 document request may elect to turn over documents in the manner in which they were kept in the course of one's business. If that is not possible, then the responding part must bear the cost of reviewing and organizing the document turnover in reasonable response to the request. In "mega-doc" cases, that can cost a lot.

protocol. First, they claim, it wrongfully requires them to pay for the production of any documents in the FDIC-R's possession, which is simply not the law. Doc. 67 at 12. And the defendants, as the requesting party, are entitled to specify the form in which the ESI must be produced. *Id.* at 13. Yet the FDIC-R, defendants assert, intends to produce the digital documents in only "native" format (defined below), not in reasonably useable form, which will entail some conversion expense. *Id.* at 13-14. The defendants want the FDIC-R to pay for the document conversion costs to a specific format. *Id.*

To that end, the defendants cite cases that have implemented their ESI Protocol. Doc. 67 at 14-15. They remind that the FDIC is required to seize and digitize the bank's documents upon takeover, so the Court should not be swayed by the FDIC-R's $614,000 document-digitization claim. *Id.* at 17. And pre- and post-receivership records are discoverable, they insist. *Id.* at 17-18 (they want to discover documents that go to pre-collapse regulatory warnings and post-receivership damage mitigation; both are relevant and thus discoverable, they contend).

The defendants also want the FDIC to "produce documents from

third-party entities over which it has control." Doc. 67 at 19; doc. 75 at 15. The Court notes that although no formal discovery had been served as of the date of the last brief filed on this matter, the parties have anticipatorily argued about defendants' forthcoming Rule 34 document requests. While that matter is technically not ripe (in a sense both parties have moved for protective orders aimed at limiting their expenses), the rulings herein by definition will apply to such requests, which are otherwise embedded within the defendants' ESI protocol arguments here.

# I. GOVERNING STANDARDS

## A. Manner of Document Production

The parties agree that their dispute is governed by Rule 26's "Required Disclosures" command and Rule 34's document production requirements, both of which embody "proportionality" standards (discovery cost allocations may slide in proportion to things like the scope of discovery, financial ability of parties, etc.).[5] Rule 34(b)(2)(E)(i) provides:

---

[5] This concept derives from the burden management and cost shifting factors found in Rule 26(b)(2), where courts consider:

(1) the extent to which the request is specifically tailored to discover relevant information; (2) the availability of such information from other sources; (3) the total cost of production, compared to the amount in controversy; (4) the total

(E) *Producing the Documents or Electronically Stored Information*. Unless otherwise stipulated or ordered by the court, these procedures apply to producing documents or [ESI]:

(i) A party must produce documents as they are kept in the usual course of business *or* must organize and label them to correspond to the categories in the request[.]

*Id.* (emphasis added). Hence, the ESI protocol here must be designed in light of the fact that each party:

may serve on each other requests "to produce and permit the requesting party . . . to inspect, copy, test, or sample . . . designated documents or electronically stored information -- including writings, drawings, graphs, sound recordings, images, and other data or data compilations" -- that are in the other party's possession. Fed. R. Civ. P. 34(a)(1)(A). Requests for the production of ESI "may specify the form or forms in which the electronically stored information is to be produced." Fed. R. Civ. P. 34(b)(1)(C). But, unless the court orders otherwise, a party need *not* produce the same ESI in *more* than one form. Fed. R. Civ. P. 34(b)(2)(E)(iii).

*Teledyne Instruments, Inc. v. Cairns*, 2013 WL 5781274 at * 4 (M.D. Fla. Oct. 25, 2013) (emphasis added); *see also Anderson Living Trust v. WPX Energy Production, LLC*, ___ F.R.D. ___, 2014 WL 930869 at * 7-10

---

cost of production, compared to the resources available to each party; (5) the relative ability of each party to control costs and its incentive to do so; (6) the importance of the issues at stake in the litigation; and (7) the relative benefits to the parties of obtaining the information. Fed. Rules Civ. Proc. Rule 26(b)(2).

71 AM. JUR. TRIALS 111 (May 2014); *see also Lindsay v. Clear Wireless LLC*, 2014 WL 813875 at * 2 (D. Minn. Mar. 3, 2014).

(D.N.M. Mar. 6, 2014) (detailing Rule 34(b)'s evolution to address document digitization, and reminding that "[i]t is only if the requesting party declines to specify a form that the producing party is offered a choice between producing in the form in which it is ordinary maintained -- native format -- or in a reasonably useful form or forms. Fed. R. Civ. P. 34(b)(2)(E)(i)-(ii).") (quotes omitted); 8B Charles A. Wright, et al., Federal Practice & Procedure § 2219 (3d ed. 2014).

"Clearly, Rule 34 contemplates that upon a part[y's] request to produce ESI, the responding party must produce it organized and labeled to correspond to the categories in the request *unless* the responding party can produce it as it is maintained in the ordinary course of its business." *F.D.I.C. v. Baldini*, 2014 WL 1302479 at * 8 (S.D. W.Va. Mar. 28, 2014) (emphasis added); *FDIC v. Giannoulias,* 2013 WL 5762397 at * 3 (N.D. Ill. Oct. 23, 2013). An ESI-responding party thus may uphold its discovery obligation by "either organiz[ing] the documents as they are kept in the usual course of business or . . . organiz[ing] and label[ling] them to correspond to the categories in the request. This rule is meant to prevent a party from obscuring the significance of documents by giving some

structure to the production." *Amer. Gen. Life Ins. Co. v. Vistana Condominium Owners Ass'n*, 2014 WL 2041950 at * 2 (D. Nev. May 16, 2014); *City of Colton v. American Promotional Events, Inc.*, 277 F.R.D. 578, 584-85 (C.D. Cal. 2011) (same principle, noting its bottom line: That the parties are entitled to rationally organized ESI productions so that they may readily identify documents); *Amer. Gen.*, 2014 WL 2041950 at * 2 ("Producing parties should not raise unnecessary obstacles for the requesting party in the production of documents.") (quotes and cite omitted).

There is no dispute that a bank's ordinary course of business is suddenly and dramatically interrupted by the FDIC's takeover. The FDIC, in the course of *its own* (bank-takeover) business, understandably alters a bank's business records. One court has held "course of business" to mean the bank's business, not the FDIC's. *W Holding Co., Inc. v. Chartis Ins. Co.*, 2013 WL 1352562 at * 5 (D.P.R. Apr. 3, 2013) ("*W Holding II*") ("To the extent that the production reasonably preserves the organization by which Westernbank's documents were 'kept in the usual course of business,' [the] FDIC–R may furnish production without further

review or labeling. Otherwise, FDIC–R must organize and label its production to correspond to the categories in the request.").

It bears noting that "[i]n the usual course of business" may vary in its details according to the type of document or file produced, but it is clear that parties are entitled under the Federal Rules to rationally organized productions so that they may readily identify documents. *Amer. Gen*, 2014 WL 2041950 at *3 (quotes and cites omitted). Even at that, the "usual course of business" alternative method of production of documents is only available when the documents' natural organization makes finding critical documents reasonably possible. *W Holding Co., Inc. v. Chartis Ins. Co. of Puerto Rico*, 293 F.R.D. 68, 71 (D.P.R. 2013) ("*W Holding I*").

Finally, "[e]ven if a party fulfills all of the technical demands of Rule 34(b)(2)(E)(i), the district court has discretion to direct a party to disclose the manner of production and provide additional information about the documents produced. Thus, although a party ordinarily is not required to provide an index of the documents produced, the court can require the party to do so." S.S. GENSLER, 1 FED. R. OF CIV. PROC., RULE 34 (Mar. 2014) (footnote omitted); *Giannoulias,* 2013 WL 5762397 at * 3 (denying

defendants' motion to compel the FDIC to categorize its Phase I production according to the defendants' requests," since FDIC's Phase I production was in ESI form, it was accompanied by an index describing produced document plus FDIC's promise to "supplement its responses to written discovery to identify responsive documents by Bates number," and failed bank executive defendants had knowledge of the records).

## B. Formatting Disputes

Many disputes in this area turn on the format in which documents are turned over. Common terms that surface here include "Native File," which "means ESI in the electronic format of the application in which such ESI is normally created, viewed, and/or modified. Native Files are a subset of ESI." *W Holding II,* 2013 WL 1352562 at * 1; doc. 73 at 8 ("Production in native format means that an electronic document is produced as it is -- a Word document, an Excel spreadsheet, an e-mail, etc., will be produced in its original format."). "Load File means the file necessary to load data into a reviewable database. A load file can, for example, specify what individual pages belong together as a document, what attachments are included with a document, where a document

begins and ends, and what metadata is associated with a document." *W Holding II,* 2013 WL 1352562 at * 1.[6] "Metadata means (i) information embedded in a Native File that is not ordinarily viewable or printable from the application that generated, edited, or modified such Native File; and (ii) information generated automatically by the operation of a computer or other information technology system when a Native File is created, modified, transmitted, deleted, or otherwise manipulated by a user of such system. Metadata is a subset of ESI." *Id.*

As one treatise points out,

> [t]here are two principal issues regarding form of production of ESI. First, most ESI is kept in text searchable form. Lawyers that want to preserve that capability should request that the ESI be produced in *native* format or in some other text-searchable format. Second, lawyers may want to seek the production of ESI in a form -- usually *native* format -- that contains metadata or other information that would not appear on a hard copy, a pdf [(Portable Document Format)] file, or other imaged production. Lawyers who want the metadata produced should make that clear in the request. But . . . the producing party may object to the form of production specified. The best approach to resolving form of production problems is for the parties to discuss the issue early on and cooperate to reach a sensible agreement.

---

[6] A load file indicates where individual pages or files belong together as documents, to include attachments, and where each document begins and ends. Without load files, there is no way "to ensure transfer of accurate and usable images and data." *E.E.O.C. v. SVT, LLC*, 2014 WL 1411775 at * 3 (N.D. Ind. Apr. 10, 2014).

8B Wright, Federal Practice & Procedure, § 2219 (footnotes omitted; emphasis added).

"Rule 34(b)(2)(E)(ii) trumps specific instructions in discovery requests such that even if native files are requested, it is *sufficient* to produce memoranda, emails, and electronic records in PDF or TIFF [(Tagged Image File Format)] format accompanied by a load file containing searchable text and selected metadata . . . because the production is in usable form, e.g., electronically searchable and paired with essential metadata." *National Jewish Health v. WebMD Health Servs. Group, Inc.*, 2014 WL 2118585 at *6 (D. Colo. May 21, 2014) (quotes and cite omitted; footnotes and emphasis added). The producing party, however, must do "nothing to compromise or significantly degrade the ability of [the requesting party] to fully search or sort the [producing party's] ESI Production." *Id.* at * 7 (quotes omitted).

### C. Digital Document Conversion Costs

Much debate arises in the case law and commentary about cost-shifting on digital format conversion expenses:

[T]he courts are required to strike a balance between allowing the

requesting party to take full advantage of the technologies available to it and protecting the producing party from having to pay to leave no stone unturned. Resting all of the costs of electronic discovery on the producing party may create a perverse incentive on the part of the requesting party to dispense with reason and restraint and unleash every new technology under the sun to try and find information that supports the requesting party's claims.

*Covad Communications Co. v. Revonet, Inc.*, 258 F.R.D. 5, 16 (D.D.C.

2009); *see also FDIC v. Brudnicki*, 291 F.R.D. 669, 677 (N.D. Fla. June 14,

2013) (cost-sharing is appropriate in a large ESI case); *Thompson v. U.S.*

*Dept. of Housing and Urban Development*, 219 F.R.D. 93, 99 (D. Md. 2003)

(court can shift part of e-discovery costs to deal with burden and ensure

proportionality; "[t]he court can, for example, shift the cost, in whole or

part, of burdensome and expensive Rule 34 discovery to the requesting

party; it can limit the number of hours required by the producing party to

search for electronic records; or it can restrict the sources that must be

checked.  It can delay production of electronic records in response to a

Rule 34 request until after the deposition of information and technology

personnel of the producing party, who can testify in detail as to the

systems in place, as well as to the storage and retention of electronic

records, enabling more focused and less costly discovery.").[7]

Formatting costs are often examined when a party claims its ESI is "inaccessible," which can mean prohibitively expensive to produce. As will be further explained *infra*, Rule 26(b)(2)(B) excuses a party from initially providing discovery from sources of ESI that are not reasonably accessible because of undue burden or cost. Such costs also figures into cost-shifting rulings. *See Zubulake v. UBS Warburg, LLC*, 216 F.R.D. 280, 284 (S.D.N.Y. 2003) (cost-shifting is only potentially appropriate when inaccessible data is sought).

A number of courts -- albeit mostly in the cost-awarding context of Fed. R. Civ. P. 54d)(1) and 28 U.S.C. § 1920 -- have decided what are reasonable copying rates in the digital format conversion cost realm. *See Race Tires America, Inc. v. Hoosier Racing Tire Corp.*, 674 F.3d 158, 162, 167 (3rd Cir. 2012) (noting that the party incurred an approximate per-page cost of $.05 to scan 430,733 pages of documents and convert them to .TIFF format); *Nobel Biocare USA, LLC v. Technique D'Usinage Sinlab, Inc.*, 2013 WL 819911 at * 5 (E.D. Va. Mar. 4, 2013) (paying

---

[7] The format conversion costs can quickly escalate out of control. *See* GETTING YOUR E-DISCOVERY MONEY BACK: TAXATION OF COSTS AND OFFER OF JUDGMENT, 54 NO. 6 DRI *For the Defense* 12 (2012).

approximately $.07 per page for "TIFF productions" and "Native productions"), *cited in SVT, LLC*, 2014 WL 1411775 at * 6 (noting that under Rule 34(b)(1)(C) the requesting party was entitled to have the responding party "produce the data in the format specified, which is native format for spreadsheets and databases and near-native (.Tiff or .pdf) format for documents."); *id.* at * 6 (finding, after reviewing digital document production estimates, the requested digital data "would require 117 hours of time at a cost of $23,900.00," *but* that the data "is not inaccessible due to undue burden or cost," then ordering the defendant responding party to "produce responsive ESI information in the format initially designated by [the requesting party] so that the information is reasonably usable, i.e., fully searchable and manipulable, with the connections between data fields intact. However, despite the extensive briefing and submissions of exhibits, a precise resolution to this conflict is not readily apparent, and the parties are ordered . . . to attempt to resolve this conflict through an in-person meet and confer.").

## II. ANALYSIS

### A. Rule 34 Production

Applying the above standards, the Court again notes that no written document requests have been served, though the parties understandably are trying to craft an ESI Protocol to enable cost minimization in contemplation of expected discovery requests that, in one form or another, instruct an opponent to "hand over all relevant documents." On balance, and given the common ground between the dueling protocols here, the FDIC-R's ESI protocol will be implemented, as modified by the FDIC-R's "briefing concessions" illuminated below, as well as by the additional guidance set forth in this Order.

First, the FDIC-R has already agreed to "locate and produce substantially all ESI documents relevant to the FDIC-R's claims in this lawsuit." Doc. 69 at 3. Second it has taken over documents generated by a failed bank, *not* a private individual or group. So even though no rule grants the requesting party the right to conduct a direct search of their opponent's stored computer memory for responsive documents, 8B Wright, Federal Practice & Procedure § 2219, nothing prevents the FDIC-R from agreeing to assist defense counsel (or their designated agent) in electronically accessing the records that, though concededly

altered in their *arrangement* by the FDIC's takeover, *the defendants themselves* generated and thus could access while operating Darby Bank.[8]

Indeed, the FDIC-R has agreed to do just that. Doc. 78 at 2 ("The FDIC-R maintains the Bank's former files in the usual course of business and can make those files available to the [D]efendants in electronic form. Moreover, [the] FDIC-R proposes to confer with Defendants and run whatever searches Defendants wish to run on the electronic records and make those 'hits' available for review and refinement."). The FDIC-R obviously cannot, as defendants point out, doc. 67 at 11 n 4, assure defendants full access to the bank's records as they existed on the date of Darby's seizure (hence, in the regular course of *Darby's* business), but there is *no* Rule 34 document request at issue yet, so the FDIC-R cannot be compelled to produce its records on that basis. Nor could it reasonably be expected to do so, given the exigent circumstances of a bank takeover. But the FDIC-R does use an online document management platform, "Relativity,"[9] doc. 69 at 3, that can be used for document turnover of

_____

[8] The parties are currently negotiating a confidentiality order. Doc. 75 at 10.

[9] As its vendor describes it, "Relativity is a web-based e-discovery platform that is horizontally and geographically distributable and centrally managed."

records as the *FDIC-R* maintains in *its* course of bank-takeover business. Doc. 78 at 2.

The FDIC-R obviously cannot satisfy the "course of business" option in Rule 34. Again, the FDIC cannot be faulted for altering the bank's records in that such is the nature of a take-over. And it does not rest on Rule 34's "course of business" option. But it obviously would be hugely burdensome to require the FDIC-R to place the Darby records back in their original order, and unduly burdensome to compel it to manually search records in support of the defendant's *defenses*. And if, as defendants claim, doc. 75 at 3, the FDIC-R has failed to turn over documents categorically referenced by its own complaint, the defendants may point that out in Rule 34 document requests and any necessary compulsion motions. Even at that, the case law recognizes that manual search costs can be devastating, so reasonable technological search and production efforts should first be attempted -- discovery law for ESI has evolved to require that much.

To that end, the FDIC-R (in its final brief) is now offering to open "all of the Bank's former documents ... [so defendants can retrieve them]

http://kcura.com/relativity/features/features-overview (site last visited June 5, 2014).

to the same extent that the FDIC-R can," doc. 78 at 4, which aligns with what other courts have ordered. *Genworth Financial Wealth Management, Inc. v. McMullan*, 267 F.R.D. 443, 447 (D. Conn. 2010) (finding cause to allow neutral to make a mirror image of party's computer information subject to defendant screening for privilege); *D'Onofrio v. SFX Sports Group, Inc*., 254 F.R.D. 129, 133 (D.D.C. 2008) (allowing access by plaintiff's expert but entrusting the expert to maintain the records securely until defendant has had a chance to screen for privilege); S.S. GENSLER, 1 FED. R. OF CIV. PROC., RULE 34 (Mar. 2014) ("if there is a good reason for it, the court can order a party to produce a hard drive or to otherwise grant access to its computer files directly."). The FDIC-R ESI Protocol even contemplates (given the nature of voluminous document exchanges like this) inadvertent privilege waivers, and thus a procedure for undoing them. Doc. 69-2 at 6-7 ¶ 11.

Similarly, the FDIC-R is offering, in "Phase II" of the disclosure process, to "meet and confer with Defendants to reach agreement upon a set of reasonable search terms to run across the database of sources of the ESI to identify documents for production." Doc. 69 at 6. That comports

with courts ordering parties to provide each other with basic search assistance. *McNulty v. Reddy Ice Holdings, Inc.*, 271 F.R.D. 569, 571 (E.D. Mich. 2011) (plaintiff was required to provide reasonable search terms and objective search criteria for use in identifying responsive ESI), *cited in* 8B WRIGHT & MILLER § 2219. The FDIC-R will even provide, at its own expense, search term "hit reports." Doc. 69 at 5; *see also* doc. 78 at 2-3. The Court views this as satisfactorily addressing the defendants' concern about an arbitrary limit, imposed by the FDIC-R, on "hit reports" that they may request. *See* doc. 75 at 12 n. 10.

This does not mean, however, that the FDIC-R must assist the defendants in *organizing* any requested ESI. *Anderson Living Trust*, 2014 WL 930869 at *13; *see also Akanthos Capital Management, LLC v. CompuCredit Holdings Corp.*, ___ F. Supp. 2d ___, 2014 WL 896743 *10 (N.D. Ga. Mar. 7, 2014) (the defendants' expense of digitizing paper documents and converting ESI from a native format may be taxable as an Fed. R. Civ. P. 54(d)(1) cost, but not "the cost of creating a dynamic, indexed and searchable database," which "is nothing more than an efficient, convenient, modern-day version of paper document review.").

While the FDIC-R must respond to defendants' discovery and inspect its own records to do so, it need

> produce only those documents that are responsive to the opposing party's requests. *See, e.g., Rothman v. Emory Univ.*, 123 F.3d 446, 455 (7th Cir. 1997) (upholding sanctions against a plaintiff who refused to fulfill "his obligation to sort through the documents and produce only those responsive to [defendant's] request"). At the same time, "there is no obligation on the part of a responding party to examine *every scrap of paper* in its potentially voluminous files in order to comply with its discovery obligations. Rather, it must conduct a diligent search, which involves developing a reasonably comprehensive search strategy." *Treppel v. Biovail Corp.*, 233 F.R.D. 363, 374 (S.D.N.Y. 2006). Employing search terms to search ESI is one such strategy. *See id.*

*Giannoulias,* 2013 WL 5762397 at * 2 (emphasis added); *see also id.* (rejecting defendants' contention that the FDIC "must inspect the documents resulting from the initial search to determine whether they are in fact responsive. In this particular case, we conclude that the burden such a review would impose on the FDIC far outweighs any benefit to the defendants.").

Here the FDIC-R may meaningfully deploy suitable search terms to satisfy its initial disclosure requirements and respond to forthcoming Rule 34 document requests, but that may be obviated through a cooperative search query formulation on an equal access document

database. The Court will presume that, in the spirit of discovery-expense-minimizing cooperation, the parties will work toward that end. *See SVT, LLC*, 2014 WL 1411775 at * 7 (noting defendant's offer to plaintiff to allow plaintiff run direct searches on its data terminal, and directing the parties to meet and confer over that potential ESI-discovery dispute). Otherwise, the Court adopts and applies the limit imposed in *Giannoulias*, 2013 WL 5762397 at * 2, for Phase II production.

In that regard, the FDIC-R says it is using something called the "Relativity" program, which the Court assumes to be the same that was examined in *Baldini*. The Court finds persuasive, and thus adopts here, that court's reasoning: If the FDIC-R does not produce the bank documents as they were kept in the normal course of the bank's business, then it is "not entitled to produce them without organizing and labeling them to conform with defendants' discovery requests," *Baldini*, 2014 WL 1302479 at * 8 (noting that years had passed since defendants had run the bank), in which case it must do the same here as it as it was ordered to do in that case: "search for all documents in its possession responsive to defendants requests, create a file in Relativity for each of defendants'

requests and put documents responsive to each of defendants' requests in its corresponding file . . . . [and] index all Non–ESI responsive documents which had been produced or would be produced in the future to conform with defendants' requests." *Id*. This apparently is what the FDIC-R already has contemplated here. Doc. 69-2 at 5-8.

In approving the FDIC-R's ESI protocol, the Court underscores the bottom line contained within ¶ 10 of that Protocol, obligating each side to "produce any and all ESI it intends to rely upon in support of any claim or defense with respect to this case," notwithstanding the document-exchange protocols set forth in its ESI Protocol. Doc. 69-2 at 6 ¶ 10. The defendants contend that the FDIC-R's Protocol "does not contemplate a production of Phase II documents that is organized based on the allegations in the Complaint." Doc. 75 at 7 n. 4. The Court directs the FDIC-R to make reasonable computer-search efforts to do just that.

As for the defendants' interest in corralling documents in support of their defenses, the FDIC-R must, as it promises in its latest brief, "confer with [d]efendants and run whatever reasonable searches [they] wish to run on the electronic records and make those 'hits' available for review

and refinement." Doc. 78 at 2-3. It also must assist them, free of charge, in loading into searchable file folders the Phase II documents referenced above, n. 2. This matches what the defendants claim their Protocol does -- enable "test productions, in order to increase the effectiveness of the search term process." Doc. 75 at 10.

Finally, if the pre-Darby-closure, "regulatory" documents are in the FDIC's (not the FDIC-R's) possession, then the Court agrees with the FDIC-R that it technically is not obligated to provide them, which means the defendants may subpoena the FDIC for same.[10] In that sense the Court specifically approves the time period limitation in the FDIC-R's Protocol, doc. 69-2 at 6 § 8 (January 1, 2005 - November 12, 2010), subject to its post-receivership documents ruling *infra*. Still, the Court will be amenable to a *"Dosland"* argument. *FDIC v. Dosland*, 2014 WL 1347118 at * 4-5 (N.D. Iowa Apr. 4, 2014) (applying 12 U.S.C. § 1821(o) and Rule 34 to remind the FDIC-R that it should exercise its statutory rights to obtain inter-agency documents responsive to the defendants' Rule 34 request).

---

[10] *But see Brudnicki*, 291 F.R.D. at 678 ("With regard to the FDIC–R's investigation of the Bank the regulatory investigations of the Bank are confidential under 12 C.F.R. § 308.147 and thus documents relating to the investigation do not have to be produced.").

The parties, after all, are obligated to try and minimize discovery expenses.

Meanwhile, the defendants are free to, upon a showing of relevancy, serve the FDIC-R with specific written discovery for post-receivership documents. *Brudnicki*, 291 F.R.D. at 678 (defendants were entitled to discovery of post-receivership documents related to the FDIC's disposition of certain loans, since the documents could have some bearing on whether its review and approval of the transactions were prudent, sound, and consistent with generally accepted banking practices). But consistent with each side's cost-minimization obligation, the Court directs the FDIC-R to consider direct-search access by defendants in order to enable the lowest cost response to all of defendants' Rule 34 requests.

## B. Digital Document Production Costs

Unless good cause to do otherwise is shown, the parties will operate under the general rule -- subject to any ESI Protocol carve-outs approved by this Court -- that the responding party bears the costs of complying with (hence, organizing and physically turning over documents for) each document request. That includes the cost of reviewing and gathering the

documents, then making them available for inspection at the time and place requested. *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 358 (1978); *Race Tires*, 674 F.3d at 170-71 (ESI case applying the *Oppenheimer* rule, but noting that the responding party may invoke the district court's discretion to grant orders protecting it from undue burden or expense in complying with discovery requests, including orders conditioning discovery on the requesting party's payment of the costs of discovery); 35A C.J.S. FEDERAL CIVIL PROCEDURE § 721 (Apr. 2014).

"Conversely, the burden generally is on the requesting party to pay the cost of *copying* the documents. However, the court may apportion the costs of production depending on the circumstances." S.S. Gensler, 1 FEDERAL RULES OF CIVIL PROCEDURE, RULES AND COMMENTARY RULE 34, (Mar. 2014) (footnotes omitted; emphasis added); *FDIC v. Johnson* 2013 WL 1195698 at *3 (D. Nev. Mar. 22, 2013) ("the court agrees with those courts which have held that a party responding to discovery requests is responsible for the initial costs of reviewing and preparing paper documents and ESI for inspection and copying, but is not responsible for paying copying costs for voluminous materials."); 1 EDISCOVERY & DIGITAL

EVIDENCE § 2:8 (Nov. 2013).

Here the Court finds appropriate the FDIC-R's initial *free* (Phase I) "native format" production, doc. 78 at 5, and relatively modest request that the defendants absorb any specialized data-subset *copying* (as opposed to organize-and-turnover) costs for Phase II production. Doc. 69 at 8; doc, 6-2 at 5-6 ¶ 7 ($.06/page native-to-static file conversion cost plus third party's $10 per gigabyte monthly hosting fee); *see also Baldini*, 2014 WL 1302479 at * 9 (accepting FDIC-R's proposal that defendants there pay it $.06/page copying costs, but noting it should be minimized since the FDIC-R "will produce ESI on disks or hard drives the cost of which is substantially less than the cost of producing the ESI in paper form."); *Johnson*, 2013 WL 1195698 at * 2-3.[11]

---

[11] This production-vs-copying cost distinction can get blurred. *See W Holding I,* 293 F.R.D. at 72 (FDIC, as receiver for failed bank, was not entitled to up-front contribution for ESI production costs in action against bank's directors and officers, absent explanation of how such costs were outside the realm of gathering and preparation expenses customarily borne by responding parties).

And, indeed, the defendants in a sense blur it here. They complain that the FDIC-R's ESI Protocol would require them to pay document-conversion (from "native" to TIFF format) costs prior to use in things like a deposition, then insist that such "cannot be reasonable." Doc. 67 at 14. But that burden falls equally on the FDIC-R, doc. 69-2 at 10-11, and goes to a *post*-production use. Even at that, the FDIC-R's protocol invites constant cooperation, including search-term formulation, then a cost-free output in what is essentially a raw format from which recipients may choose to convert same to the end-format they desire. Doc. 69-2 at 4-5. Computers can

A word about "inaccessibility." "Under Rule 26(b)(2)(B), parties need not initially provide discovery from sources of ESI that are not reasonably accessible because of undue burden or cost. Rather, the responding party can identify the sources that qualify and state that it is not searching them. Thereafter the responding party need not search these sources unless the court orders so for good cause." S.S. Gensler, 1 FEDERAL RULES OF CIVIL PROCEDURE, RULES AND COMMENTARY RULE 26 (Mar. 2014) (footnotes omitted); *Zeller v. South Cent. Emergency Medical Services, Inc.*, 2014 WL 2094340 * 9 (M.D. Pa. May 20, 2014). Should "inaccessible material" search costs arise, the affected party may seek judicial assistance if informal resolution attempts fail.[12]

---

still be used to search the raw data; copying costs can be controlled by the parties (they decide, after all, what documents to use at a deposition or before a factfinder).

Hence, the Court sees no problem with charging the defendants a reasonable copying expense for Phase II documents demanded and produced beyond any initial Rule 34 obligation. *See Brudnicki*, 291 F.R.D. 669, 675-76 (FDIC-R's ESI protocol for marginally relevant, "phase II" documents, in its action against bank's former directors, was appropriate, reasonable, and consistent with principles of proportionality, even though it required defendants to pay some costs of producing ESI from database that purportedly did not fall within definition of inaccessible ESI; proposed protocol was not a cost-shifting device, as FDIC already had spent some $624,000 to identify, collect, and store all information on database, which was set up to make discovery less expensive and more expeditious, costs to defendants were minimal, namely, $0.06 per page charge for converting documents plus nominal charge for uploading data to database, estimated to be no more than $200 per month, defendants' discovery requests were broad, and FDIC had agreed to produce the 61,000

Otherwise, "it is typically inappropriate to consider cost-shifting" when the source is otherwise accessible. *Zubulake,* 216 F.R.D. at 284; *accord*, *Zeller,* 2014 WL 2094340 at * 10. And exaggerated inaccessibility claims are rejected. *SVT, LLC*, 2014 WL 1411775 at * 5-6 (analyzing dispute over ESI production in different formats before concluding that producing party's "data is not inaccessible due to undue burden or cost."); *W. Holding Co. I*, 293 F.R.D. at 73 ("Because FDIC–R has not shown that access to the Westernbank data is hindered by any unique technological hurdles, it has failed to trigger Rule 26(b)(2)(B). It is therefore not entitled to categorically label [its specially created] databases 'not reasonably accessible.'").

Finally, the parties also will abide by the bottom line contained in Advisory Committee Note to 2006 amendment to Rule 34(b): "If the responding party ordinarily maintains the information it is producing in a

---

[12] The case law has spawned various tests and approaches, including a "marginal-utility approach," which "holds that the more likely it is shown that a search of electronic material will discover critical information, the fairer it is to require the responding party to bear the search costs." LITIGATION MANAGEMENT HANDBOOK § 7:31 (Nov. 2013). The Court is inclined to use that approach here. But "[u]ntil the parties take affirmative steps to conduct discovery -- perhaps after test runs, for instance -- there is no ground for the court to dramatically alter the defaults under the Federal Rules of Civil Procedure." *W Holding II*, 293 F.R.D. at 74.

most relevant documents at no cost).

way that makes it searchable by electronic means, the information should not be produced in a form that removes or significantly degrades this feature." *Id.*, quoted in *National Jewish Health,* 2014 WL 2118585 at *5; *see also id.* ("[I]f the request does not specify a form of production, the responding party must produce ESI in the form in which it is ordinarily maintained or in a reasonably usable form or forms.").

### C. Duty to Confer

Since their opening briefs (docs. 67 & 69), the parties have filed 41 more pages of briefs on this one discovery matter.  Docs. 73, 75 & 78. From the last brief (the FDIC-R's) it is clear that, by "conferring" *through their briefs*, the parties have managed to resolve many of their disagreements, even though (as of the last brief's filing) the defendants have yet to serve FDIC-R with any discovery.  Doc. 78 at 4.  For example, the FDIC-R is now promising to comply fully with Rule 34 when any document requests are served on it.  *Id.* at 2.  And it will confer with the defendants "and run whatever reasonable searches [they] wish to run on the electronic records and make those 'hits' available for review and

refinement."[13] *Id.* at 3.  It reminds that it will produce all ESI in its native format at no cost to the defendants.  *Id.* at 5.

Such cooperation, coming at the tail end of a comprehensive briefing cycle, reminds that "[d]iscovery in federal court is a self-managed process." *Teledyne*, 2013 WL 5781274 at * 4.  It also shows the benefits of *meaningfully* conferring with each other about this matter before further consuming this Court's resources.  *Hernandez v. Hendrix Produce, Inc.*, 297 F.R.D. 538, 540 n. 3 (S.D. Ga. 2014) (collecting "duty to confer" cases); *State Farm Mut. Auto. Ins. Co. v. Howard*, 296 F.R.D. 692, 697 n. 11 (S.D. Ga. 2013) (the conference must also be meaningful; more than a "we met and talked" certification is needed). In this context it makes sense to order a face-to-face meeting, with opposing IT staffs, given the sheer complexity of the ESI dispute before it.  *SVT, LLC*, 2014 WL 1411775 at * 5-6.

Should there be any further ESI-protocol disagreement (or objection to this ruling), the parties shall first confer and attempt to craft a Joint ESI Protocol or Consent Order in light of the above principles.  *Id.* (court resolved initial ESI issues but ordered parties to "meet and confer" before

---

[13] As was recently seen in *Progressive Cas. Ins. Co. v. Delaney*, 2014 WL 2112927 at * 4-5 (D. Nev. May 20, 2014), this "search-term cooperation" is especially critical in cutting the cost of searching databases believed to contain privileged information.

invoking more judicial assistance); *Delaney*, 2014 WL 2112927 at * 5 ("the court ordered the parties to have their ESI experts and representatives from each of the related cases to meet and confer to have a meaningful discussion about how to resolve the outstanding ESI issues. . . ."); *W Holding I.*, 293 F.R.D. at 75 (ordering former directors and officers of failed bank, who were "more likely to have an idea of what documents they are looking for in a particular request," to "propose search terms first; though since FDIC–R oversaw the loading of ESI into [its document database], it is expected to provide active assistance, and should anticipate consulting its technically skilled staff or contractors as necessary."); *Ford Motor Co. v. Edgewood Properties, Inc.*, 257 F.R.D. 418, 425 (D.N.J. 2009) (if the requesting party objects to the responding party's proposed form for the production of ESI and states an alternative form, the parties must meet and confer in an effort to solve the dispute before filing a motion to compel).

To that end, the parties shall consider the use of predictive coding:

Magistrate Judge Andrew Peck of the Southern District of New York has published a white paper identifying ten best practices in predictive coding. M.J. Peck, *Top Ten Best Practices of Predictive Coding*. Judge Peck is also the author of an ESI decision in *Da Silva*

> *Moore v. Publicus Groupe*, 2012 U.S. Dist. LEXIS 23350 (S.D.N .Y.
> Feb. 24, 2012) which addressed the use of predictive coding.
> Predictive coding, or technology assisted review, uses software that
> can be trained by a human being to distinguish between relevant
> and non-relevant documents. J. Peck, *Ten Top Best Practices in
> Predictive Coding*. However, the quality of its product depends on
> the quality of the information used to "train" the software. *Id*. A
> human being, usually an experienced attorney involved in the
> litigation, referred to as the "expert" trains the software to identify
> relevant documents from the universe of ESI collected for review for
> production in discovery. *Id*.

*Delaney*, 2014 WL 2112927 at * 8; *see also id.* ("Predictive coding has emerged as a far more accurate means of producing responsive ESI in discovery. Studies show it is far more accurate than human review or keyword searches which have their own limitations."); EDISCOVERY FOR CORPORATE COUNSEL § 7:6 (Dec. 2013) (collecting cases). The parties shall also consider the blend of ESI predictive coding and "pretrial statements signed by counsel" discussed in *In re Domestic Drywall Antitrust Litigation*, ___ F.R.D. ___, 2014 WL 1909260 at * 4 (E.D. Pa. May 12, 2014) (reasoning that in complex cases where, during discovery, attorneys likely will learn more facts than their corporate clients, "[p]retrial statements signed by counsel are preferable to interrogatory answers.").[14]

---

[14] As that court further explained:

## III.  CONCLUSION

The Court **GRANTS** plaintiff FDIC-R's motion to implement its protocol (doc. 69), subject to the above guidelines and instructions.   The defendants' protocol motion (doc. 67) is **DENIED**.

**SO ORDERED** this 6th day of June, 2014.

UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA

---

The Manual for Complex Litigation supports using statements of contentions. In a somewhat different procedural context, § 11.473 suggests the process begin with "the court order[ing] counsel for one side, typically the plaintiff's, to draft a series of numbered, narrative statements of objective facts that they believe can be established, avoiding argumentative language, labels, and legal conclusions." MANUAL FOR COMPLEX LITIG. (FOURTH) § 11.473 (2004). This process can streamline litigation by narrowing the facts that remain in dispute. *Id.* The Manual counsels judges to consider "the time and expense expended" in identifying facts that remain in dispute. *Id.* In addition, there is ample precedent for requiring pretrial statements. *See, e.g., U.S. v. Am. Tel. & Tel. Co.*, 461 F.Supp. 1314, 1346–47 (D.D.C.1978) ("The procedures specified herein are designed to move the case along while seeking to escape the adverse consequences inherent in the several contending methods of handling the pretrial process."); *In re Ampicillin Antitrust Litig.*, 88 F.R.D. 174, 180 (D.D.C.1980) (requiring three successive pretrial statements to narrow the issues and bring the case to trial in a reasonable period of time).

*Id.*, 2014 WL 1909260 at * 5.